**UNITED STATES of America,**
**Plaintiff,**

v.

**DICO, INC. and Titan Tire Corporation, Defendants.**

4:10–cv–00503

United States District Court, S.D. Iowa, Central Division.

Signed 09/05/2017

Elizabeth L. Loeb, Eric C. Albert, Sara C. Colangelo, Steven D. Shermer, Zachary Nathaniel Moor, U.S. Department of Justice–Environment & Natural Resources Environmental Enforcement Section, Washington, DC, Robyn E. Hanson, United States Department of Justice, ENRD, Denver, CO, for Plaintiff.

Michael F. Iasparro, Hinshaw & Culbertson LLP, Rockford, IL, Sergio Enrique Acosta, Thomas D. Lupo, Joel David Bertocchi, Pro Hac Vice, Hinshaw & Culbertson LLP, Chicago, IL, Mark McCormick, Stephen H. Locher, Belin Mccormick, P.C., Des Moines, IA, Defendants.

## ORDER ON BENCH TRIAL

ROBERT W. PRATT, Judge

The United States of America (the "Government") filed this action against Dico, Inc. ("Dico") and its corporate affiliate Titan Tire Corporation ("Titan Tire") (collectively "Defendants") under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.* Clerk's No. 1. After awarding summary judgment to the Government as to each of its claims, the Court held a bench trial on civil penalties and punitive damages from December 2 through December 5, 2013.

On appeal, the United States Court of Appeals for the Eighth Circuit affirmed in part and reversed in part the prior rulings of this Court, remanding the case for a trial on the merits on certain issues with respect to which it concluded genuine disputes as to material facts precluded summary judgment. On remand, the Court held a bench trial on the merits as to those issues from April 3 through April 6, 2017. The parties submitted proposed findings of fact and conclusions of law on May 5, 2017. Clerk's Nos. 347, 348. The case is fully submitted.

## I. PROCEDURAL HISTORY

This action concerns the sale of several buildings by Dico through Titan Tire to Southern Iowa Mechanical, L.L.C. ("SIM"). *United States v. Dico, Inc.*, 808 F.3d 342, 345 (8th Cir. 2015). In March 1994, years prior to this sale, the presence of hazardous polychlorinated biphenyls ("PCBs") was discovered in several buildings on property owned by Dico located in Des Moines, Iowa ("the Dico site"). *Id.* Relying on its authority to issue "such orders as may be necessary to protect public health and welfare and the environment" under 42 U.S.C. § 9606(a) of CERCLA, the Environmental Protection Agency ("EPA") initiated a removal action and issued a unilateral administrative order ("the 1994 Order") that required Dico to address the contamination by, among other things, repairing and encapsulating all the remaining insulation in the buildings to prevent the further release of PCBs into the environment. *Dico*, 808 F.3d at 345.

The 1994 Order imposed continuing obligations on Dico concerning the affected buildings. *Id.* at 352–53. In particular, paragraph 31 of the order required Dico to submit and implement an operation and maintenance plan addressing "the actions necessary to ensure the protectiveness and integrity of the removal action," including the maintenance of all interior surface sealing and the encapsulation of all building insulation, and to complete "appropriate reporting, including, at a minimum, submittal of a written report on an annual basis." *Id.* at 352. And paragraph 59 of the order required Dico to "immediately take all appropriate action" and "immediately notify" the EPA should any "change in site conditions" cause or threaten to cause the further release of hazardous substances. *Id.* at 353.

In 2007, Titan Tire entered into three transactions with SIM on behalf of Dico involving several buildings, each of which was subject to the 1994 Order with the exception of the northern end of a building known as the Production Building. *Id.* at 345–46. After purchasing the buildings, SIM dismantled them and disposed of the materials used to construct them other than the steel beams they contained, which were relocated to its property in Ottumwa, Iowa ("the SIM site"). *Id.* at 346.

In September 2007, the EPA learned that buildings subject to the 1994 Order had been dismantled and sold. *Id.* The EPA subsequently traced the steel beams to the SIM site and discovered PCBs in insulation still attached to the beams and in the surrounding soil. *Id.* Negotiations to reach an administrative settlement regarding the cleanup of the SIM site ensued but were ultimately unsuccessful, and the EPA initiated a removal action at the SIM site, issuing a new unilateral administrative order requiring Dico and Titan Tire to work with an environmental contractor to retrieve and dispose of insulation there ("the 2008 Order"). Ex. 80; *see also* Clerk's No. 128 at 12. As a result, more than four tons of insulation were removed from the SIM site, the testing of which revealed the presence of PCBs. *Dico*, 808 F.3d at 346.

In October 2010, the Government filed this suit against Dico and Titan Tire, alleg-

ing two distinct violations of CERCLA. Clerk's No. 1. First, the Government alleged Defendants violated 42 U.S.C. § 9607(a) by arranging for the disposal of a hazardous substance by means of the sales that led to the dismantling of buildings subject to the 1994 Order. *Id.* at 1–2, 8, 11–12. In relation to this "arranger liability" claim, the Government sought to recover all past and future response costs it incurred in connection with response actions pertaining to the SIM site pursuant to 42 U.S.C. § 9604. *Id.* at 11–12, 14. Next, the Government alleged Dico violated 42 U.S.C. § 9606(b)(1) by violating the terms and conditions of the 1994 Order. *Id.* at 9–10, 12–14. In relation to this allegation, the Government sought civil penalties and punitive damages pursuant 42 U.S.C. § 9607(c)(3) based on the costs it had incurred in responding to the release or threatened release of PCBs at the SIM site. *Id.* at 12–14.

In August 2012, the Court heard oral argument on motions filed by the Government seeking partial summary judgment with respect to Defendants' liability for arranging for the disposal of a hazardous substance, Dico's liability for civil penalties and punitive damages, and the recoverability of the Government's response costs related to the SIM site removal action. *See* Clerk's Nos. 79, 93, 97, 98. Following the hearing and extensive briefing by the parties, the Court entered two separate orders on the three pending motions. Clerk's Nos. 119, 128; *see also* Clerk's Nos. 61, 62, 63, 68, 69, 70, 74, 75, 78, 94, 95, 96, 122, 123, 124–1, 127.

First, on September 24, 2012, the Court granted partial summary judgment to the Government on its arranger liability claim, concluding Defendants had intentionally arranged for the disposal of PCBs by selling the PCB-contaminated buildings to SIM. Clerk's No. 119 at 14–40. Months later, on March 6, 2013, the Court granted partial summary judgment to the Government on the question of whether Dico had violated the 1994 Order, concluding Dico necessarily did so by arranging for the demolition of the buildings subject thereto and by failing to immediately notify the EPA of the resulting change in conditions at the Dico site. Clerk's No. 128 at 37, 39, 43. The Court further concluded Dico could be held liable for both civil penalties and punitive damages because it lacked sufficient cause to violate the order. *Id.* at 30–31, 40–42. Pursuant to its ruling on arranger liability, the Court ruled Defendants were liable for all response costs the Government had incurred or would incur resulting from the SIM site removal action. *Id.* at 43. But the Court concluded a bench trial was necessary to determine "the amount, if any, of civil penalties and/or punitive damages to be assessed" against Dico based on its violations of the 1994 Order. *Id.*

The Court held the bench trial on civil penalties and punitive damages on December 2 through December 5, 2013. Clerk's No. 198 at 2; *see* Clerk's Nos. 192, 193, 194. Following the trial, the Court issued an order directing the entry of a judgment holding Defendants jointly and severally liable for $1,477,787.73 in response costs already incurred and reported in connection with the SIM site on the arranger liability claim and holding Dico liable for $1,620,000.00 in civil penalties ($10,000 per day for each of the 162 days during which the disassembly of the buildings took place) and $1,477,787.73 in punitive damages (an amount equivalent to the total response costs the EPA had already incurred and reported in connection with the SIM site) based on its violations of the 1994 Order. Clerk's No. 198 at 14, 28–31. The Court further ordered the entry of a declaration stating Defendants would be liable for unreported and future response costs incurred in connection with the SIM

site removal action and ordered the Government be allowed to recover its costs incurred in this action. *Id.* at 30–31.

On appeal, the Court of Appeals reversed and vacated the grant of summary judgment to the Government on the question of arranger liability and vacated this Court's order with respect to response costs "specifically associated with" its finding on that issue. *Dico,* 808 F.3d at 351. But the Court of Appeals affirmed the grant of summary judgment to the Government on the question of whether Dico had violated the 1994 Order, concluding Dico had necessarily violated paragraphs 31 and 59 of the order by permitting the disassembly of buildings subject thereto and by failing to notify the EPA of the resulting change in conditions at the Dico site. *Id.* at 352–54, 355. Notwithstanding that affirmance, though the Court of Appeals affirmed the associated award of civil penalties to the Government, it vacated the punitive damages awarded based on the response costs the Government had incurred in connection with the SIM site. *Id.* In reversing that award, the Court of Appeals emphasized that the conduct amounting to violations of the 1994 Order violations established at summary judgment involved the *disassembly* of the buildings at the Dico site and the subsequent *failure to notify* the EPA of this change in conditions, not the *sale* of the buildings to SIM with the intent to dispose of a hazardous substance. *See id.* Consequently, the Court of Appeals concluded the costs the Government incurred in connection with the SIM site, which was contaminated as a result of the *sale* of the buildings to SIM and not merely the disassembly of the buildings or failure to notify the EPA, could not serve as the basis for a punitive damages award in connection with the 1994 Order violations with respect to which summary judgment was affirmed. *See id.*

On remand, the Court ruled on competing motions filed by the parties. *See generally* Clerk's No. 298. In particular, Defendants filed motions for partial summary judgment with respect to the issues of arranger liability, punitive damages, and the recoverability of attorney fees and other enforcement costs associated with prosecuting the 1994 Order violations. *See generally* Clerk's Nos. 235, 236. The Court denied the motions. Clerk's No. 298 at 9–31, 40–41. In addition, the Government filed a motion to exclude certain issues from trial on remand. *See generally* Clerk's No. 246. The Court granted the motion in part, concluding the law of the case doctrine barred the parties from presenting at trial (1) any argument, evidence, opinion, or testimony as to the origin of the PCBs discovered at the SIM site and (2) any argument, evidence, opinion, or testimony for the sole purpose of challenging the consistency with the national contingency plan ("NCP") of any response costs originating from response actions disclosed prior to the issuance of its March 2013 order. Clerk's No. 298 at 32–42.

Defendants thereafter filed an emergency motion seeking an order compelling the Government to produce communications exchanged between a team of attorneys working for the Department of Justice ("DOJ") and a witness or, in the alternative, an order prohibiting the Government from offering portions of the witness's deposition at trial. *See generally* Clerk's No. 319. The Court denied the request to compel production of the communications, concluding the work-product privilege shielded them from compelled disclosure because the Government had met its burden of establishing they constituted at least ordinary work product and Defendants had failed to demonstrate a substantial need for their production. Clerk's No. 337 at 7–25, 29. The Court also denied Defendants' alternative re-

quest that the Government be precluded from offering the witness's deposition at trial, concluding that, under the totality of the circumstances, Defendants would not be unfairly prejudiced by its admission into evidence. *Id.* at 25–29.

Prior to trial, the parties filed motions in limine. *See generally* Clerk's No. 325; *see also* Clerk's Nos. 301, 302. The Court admitted subject to Defendants' objection updated cost summaries submitted by the Government detailing its costs associated with this action. Clerk's No. 325 at 11–12, 14. But the Court denied Defendants' request either to exclude all evidence the Government had incurred response costs "as a result of" Dico violating the 1994 Order or, in the alternative, to permit Dico to present evidence it had sufficient cause for its failure to take prompt removal or remedial action with respect to the SIM site. *Id.* at 12–14; *see also* Clerk's No. 333 at 3–8.[1]

The Court held a bench trial on the remaining issues with respect to the merits of the case on April 3 through April 6, 2017. *See* Clerk's Nos. 343–346. Testifying live before the Court on behalf of the Government were Mary Peterson, Herbert Duane Jr., and James Hughes. *See* Clerk's No. 343. Testifying live on behalf of Defendants were William Campbell, Mel Pins, Brian Mills, Dr. Remy Hennet, and Daniel

Hoffman. In addition, the parties jointly designated for admission transcripts of deposition testimony, testimony from the 2013 bench trial, or both given by the following individuals: Mary Peterson, William Campbell, Brian Mills, Daniel Hoffman, Gary Schuster, Donald Brown, James Fechter, Dr. Gazi George, Quintin MacDonald, and Louis Barrentine. Following the trial, the parties submitted proposed findings of fact and conclusions of law. Clerk's Nos. 347, 348.

## II. FINDINGS OF FACT

Federal Rule of Civil Procedure 52(a) requires that in any action tried without a jury, "the court must find the facts specially and state its conclusions of law separately." In performing the related task of determining the credibility of the witnesses and the weight to be accorded their testimony, the Court has taken into consideration the following: the character of the witnesses; their demeanor on the stand, if their testimony was live; their memory, knowledge, education, intelligence, and experience; their opportunity to have seen or heard the things they testified about; their apparent capacity and willingness to truthfully and accurately describe what they observed; whether they said something different at another time and whether any such prior inconsistent statement

---

1. In denying the latter request, the Court explained that, in determining whether the "sufficient cause" defense set forth in 42 U.S.C. § 9607(c)(3) applies, "the relevant question . . . [was] whether Dico had sufficient cause to disregard its continuing obligations under the EPA Order concerning the Dico site when it sold the buildings to SIM, not whether Dico failed to act promptly in response to the threat of contamination at the SIM site." *Id.* at 14. The Court indicated Defendants could submit evidence concerning that limited question at trial. *Id.* The Government thereafter filed an emergency motion for reconsideration asking the Court to alter or amend its ruling to state that Dico would not be permit-

ted to present evidence seeking to establish it had sufficient cause to violate the 1994 Order at trial. *See generally* Clerk's Nos. 326, 326–1. The Court granted the motion for reconsideration and struck from the ruling the sentence indicating Defendants could present evidence at trial as to whether Dico had sufficient cause to justify its noncompliance with the 1994 Order when it sold the buildings subject thereto to SIM, concluding it was the law of the case pursuant to the appellate decision affirming the award of civil penalties that Dico lacked sufficient cause to disregard its continuing obligations under the 1994 Order. *See* Clerk's No. 333 at 3–8.

was made under oath; any reasons they might have for testifying a certain way including their relation to or feeling toward the parties or their interest, if any, in the result of the trial; whether their testimony sounded reasonable; the probability or improbability of their statements; whether or to what extent their testimony was consistent with, supported by, or contradicted by other evidence in the case; and all other facts and circumstances given in evidence that tend to show whether they are worthy of belief. Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit, Instruction 3.03 & n.1 & cmt. (2017) (quoting *United States v. Merrival*, 600 F.2d 717, 719 (8th Cir. 1979); *United States v. Phillips*, 522 F.2d 388, 391 (8th Cir. 1975); *Clark v. United States*, 391 F.2d 57, 60 (8th Cir. 1968)).

The parties have stipulated to a number of facts. *See* Order Following Pretrial Conference (Clerk's No. 316) at 1; Approved Proposed Order on Final Pretrial Conference (Clerk's No. 317) at 3–9. The following factual findings include facts to which the parties have stipulated, findings as to the credibility of the witnesses whose testimony the Court admitted at trial, and additional facts the Court finds based on the evidence admitted at trial taken as a whole.

The Court finds the following with respect to individuals and business entities who were the subject of admitted testimony:

- Defendant Dico is a corporation organized and existing pursuant to the laws of the State of Delaware.
- Defendant Titan Tire is a corporation organized and existing pursuant to the laws of the State of Illinois. Titan Tire makes decisions concerning the management of property owned by Dico to the extent directed by the board of directors and officers of Dico.

- SIM is a mechanical maintenance contractor located in Ottumwa, Iowa, that contracts to perform tasks such as industrial maintenance and repair for industrial operating facilities. SIM is not a demolition contractor and is unfamiliar with the sorts of preparations necessary to safely dismantle an industrial building. SIM regularly receives equipment and material that can be reused, sold, or sold for scrap during the course of its mechanical contracting jobs.
- James "Jim" Hughes is the president and owner of SIM. Hughes has been in the mechanical maintenance contracting business since 1982. Prior to joining SIM in 2001, Hughes owned his own mechanical maintenance contracting business called Midwest Services. In 2004, Hughes acquired SIM. At that time, Hughes had an extensive history with Titan Tire, having regularly performed work for them as a mechanical maintenance contractor since at least 1994 with annual billings as high as $900,000. SIM performed work for Titan Tire until January 2009. Hughes testified in person during both bench trials, though the Court notes that none of his testimony from the 2013 bench trial was designated by the parties for admission in the bench trial on remand. Two affidavits containing his sworn statements were admitted in the bench trial on remand. Exs. 1023, 2031. Having had ample opportunity to observe Hughes's demeanor, the Court finds he was a credible witness with firsthand knowledge of several relevant events whose testimony was direct, forthright, and particularly helpful to the Court in its role as factfinder.
- Glenn Curtis was the EPA Remedial Project Manager for the Dico site

until approximately 1995. He later served as the Chief of the Iowa/Nebraska Branch of the Superfund Division of EPA Region 7. Neither party sought the admission of testimony by Curtis into evidence in the bench trial on remand.

- Mary Peterson replaced Glenn Curtis as the EPA's Remedial Project Manager for the Dico site around 1995 and continued in that role through 2010. Prior to that time, she was the Assistant Remedial Project Manager for the Dico site. Thereafter, she was promoted to the position of Division Director for the Superfund Division of EPA Region 7. Peterson testified in person during both bench trials and was deposed in connection with this case, and the parties jointly designated portions of her prior sworn testimony for admission into evidence in the bench trial on remand. Her testimony was supported by the voluminous records maintained by the EPA regarding the Dico site. Having had ample opportunity to observe Peterson's demeanor, the Court finds she was a credible and responsive witness with extensive firsthand knowledge of relevant events, whose testimony was clear, detailed, and helpful to the Court in its role as factfinder.

- Maurice "Morry" Taylor is the president of Dico and is familiar with the environmental history of the Dico site. Taylor authorized William Campbell, president of Titan Tire, to sell buildings on the Dico site, including those subject to the 1994 Order. Neither party sought the admission of testimony by Taylor into evidence in the bench trial on remand.

- Cheri Holley was the general counsel of both Dico and Titan Tire from March 1994 until 2015. She was also the Corporate Secretary of Titan Tire at all times relevant to this case. Along with Morry Taylor, Holley was responsible for managing environmental matters related to the Dico site. In this capacity, Holley assigned responsibilities to and oversaw the work of employees and outside consultants with respect to environmental matters. Employees supervised by Holley to some degree in their performance of duties involving the buildings subject to the 1994 Order include, at a minimum, Dan Buttars, Brian Mills, Thomas Duncan, Dr. Gazi George, Quintin MacDonald, and Louis Barrentine. Holley received copies of numerous documents referencing matters pertaining to the 1994 Order and ongoing remedial requirements involving the buildings subject thereto from both the EPA and individuals communicating with the EPA on behalf of Dico. Holley oversaw the preparation of reports and regularly reviewed and edited written correspondence sent to the EPA on behalf of Dico. Neither party sought the admission of testimony by Holley into evidence in the bench trial on remand.

- William "Bill" Campbell was the president of Titan Tire from May 1, 2001, until 2012. He presently works as a consultant for Titan International and reports to Morry Taylor. As president of Titan Tire, Campbell had responsibilities related to environmental compliance at the Dico site pursuant to a delegation of authority from Taylor. For example, Campbell regularly directed various Titan Tire employees and outside environmental consultants to perform environmental work at the Dico site. Also pursuant to a delegation of au-

thority from Taylor, Campbell negotiated and authorized the sales of the buildings on the Dico site to SIM. Campbell testified in person during both bench trials and was deposed in connection with this case, and the parties jointly designated portions of his prior sworn testimony for admission into evidence in the bench trial on remand. Having had ample opportunity to observe Campell's demeanor, the Court finds he was generally not a credible witness. Campbell was often defensive, evasive, and vague in responding to questions posed to him; in some instances, he was outright nonresponsive or perceptibly hostile toward these proceedings.[2] His testimony was internally inconsistent and inconsistent with the testimony of other witnesses. Additionally, his recollection of key events and related explanatory testimony were at times highly implausible given the testimony of other individuals testifying on Defendants' behalf.

- Gary Carlson was the president of Titan Tire prior to Bill Campbell. Neither party sought the admission of testimony by Carlson into evidence in the bench trial on remand.

- James "Jim" Fechter was employed by Titan International as a corporate environmental engineer from 1993 to 1998. In this capacity, Fechter provided environmental management services for various Titan International subsidiaries. Fechter was responsible for environmental compliance at the Dico site, including general regulatory compliance, permitting, waste disposal, and wastewater discharge. Fechter left employment with Titan International in 1998. Fechter testified under oath in connection with this case during a deposition taken in March 2012, and the parties jointly designated portions of his deposition testimony for admission into evidence in the bench trial on remand. Particularly considering the content of this testimony in the context of the evidence as a whole and the lack of relationship between Fechter and any party to this action at the time the testimony was given, the Court finds he was generally credible as a witness. Fechter gave detailed, plausible responses to questions posed to him and had a clear recollection of past events of which he had firsthand knowledge. However, Fechter was also direct and forthcoming about the limits of his recollection.

- Thomas Duncan became the corporate environmental compliance manager for Titan International when Jim Fechter ended his employment with the company in 1998 and continued in that role until 2001. During that time, Duncan provided environmental management services for Dico at the direction of Cheri Holley. Upon his hiring, Duncan assumed the duties Fechter had previously performed with respect to maintenance at the Dico site. Neither party sought the admission of testimony by Duncan into evidence in the bench trial on remand.

- Donald "Don" Brown was employed by Dico from 1971 until the early 2000s and served as superintendent of the Dico site during the 1994 re-

---

By its nature, that incident cannot be sufficiently reflected in the transcript; however, Campbell's acrimony toward the Court and these proceedings was clear in that moment.

moval action. From 1994 until several years after he left Dico, Brown was responsible for ensuring maintenance on the Dico buildings was properly performed, including maintenance that was required as part of the operation and maintenance plan implemented in order to comply with the 1994 Order. Brown understood that complying with the operation and maintenance plan was required by the EPA. In December 2002, Brown accompanied EPA contractors on the site inspection for the third five-year review of the remedial actions taken at the Dico site, during which they discussed the requirements of the operation and maintenance plan applicable to the buildings. In July 2003, Brown conducted the annual inspection of the regulated buildings with Dan Buttars. Brown would later be the primary contact for SIM during the negotiation of the 2007 transactions in which SIM purchased the Dico buildings subject to the 1994 Order. Following his retirement from Dico and continuing through the date of the 2013 bench trial, Brown began working as a part-time consultant for Titan Distribution who consults periodically with Titan Tire and Dico. Brown was deposed and testified in person during the 2013 bench trial conducted in connection with this case, and the parties jointly designated portions of his prior sworn testimony for admission into evidence in the bench trial on remand. Having previously had the opportunity to observe Brown's demeanor and having carefully considered his testimony in the context of the evidence of the whole—in particular its inconsistencies with other testimony admitted in this case—the Court finds Brown was only somewhat credible as a witness. Brown's testimony was at times vague and unhelpful, and his responses to questions regarding key events were often incomplete, imprecise, or inconsistent with the testimony of other individuals testifying on Defendants' behalf.

- Dr. Gazi George owns a consulting business called George Technical Services, Inc. In the summer of 2000, Cheri Holley retained George as an environmental consultant for Titan International and Dico.[3] George answered to and was directed by Holley and regularly performed work pertaining to the Dico site, but he was paid by Titan International. From May 2005 to February 2007, George did not perform any consulting work for Dico because he was serving time in federal prison following his convictions for two environmental felonies in connection with his past work as an environment consultant for another consulting business.[4] Following his release from federal prison, George returned to consulting for Dico in May 2007. George was deposed in connection with this

3. George had previously been retained by Cheri Holley in late 1992 or 1993 to evaluate risks associated with anticipated environmental litigation at the Dico site and advise Titan International as to whether it should purchase Dico.

4. In September 2004, George pled guilty to knowingly violating a requirement of a water pretreatment program approved by the EPA in violation of 33 U.S.C. § 1319(c)(2)(A) and knowingly causing another to transport hazardous waste to a landfill that lacked a permit to accept it in violation of 42 U.S.C. § 6928(d)(1). Ex. 1129. The United States District Court for the Eastern District of Michigan sentenced him to twenty-seven months' incarceration on each count, to be served concurrently. Ex. 1130.

case in March 2012. At that time, George worked as a full-time consultant for Titan International, and his son worked as a full-time consultant for Titan Wheel. Additionally, approximately five years prior to his deposition, his brother was retained by Titan International to perform sampling work on its behalf through his own company. The Court admitted portions of George's testimony into evidence over Defendants' objection. *See* Clerk's No. 337. Having reviewed that testimony in the context of the evidence of the whole and taking into account George's interest in the continued employment of himself and his son, the Court finds he was somewhat credible. Although his testimony was evasive at times, he occasionally spoke to factual details with sufficient specificity to bolster the plausibility of his version of select events with respect to which there was conflicting testimony.

- Dan Buttars was an environmental coordinator with Titan Tire from 2000 to 2004. Pursuant to a delegation of authority from Morry Taylor, Buttars was authorized to perform work pertaining to environmental matters at the Dico site as directed by Bill Campbell through Cheri Holley. Jeff Kramer was his day-to-day supervisor, but Buttars communicated with Campbell or Holley regarding environmental matters related to the Dico site. The duties Buttars performed as the environmental coordinator responsible for the Dico site included conducting annual inspections of the buildings, preparing annual reports, and communicating with the EPA on behalf of Dico. Thus, Buttars corresponded with the EPA regarding Dico's request to modify the operation and maintenance plan in 2003. Following the approval of the revised work plan for operation and maintenance of the remedial actions taken at the Dico site, Buttars wrote a letter to the EPA confirming Dico would notify the EPA of any change in the status of the buildings. Neither party sought the admission of testimony by Buttars into evidence in the bench trial on remand.

- Jeff Kramer was the operations manager of Titan Tire in the early 2000s. Kramer supervised Dan Buttars in the performance of his work as environmental coordinator for Titan Tire and was copied on various correspondence Buttars sent to the EPA, including correspondence referring to the 1994 Order and the operation and maintenance plan. Kramer also attended at least one meeting with Jim Hughes concerning the sale of the buildings. Kramer later attended at least one meeting with Hughes concerning SIM's purchase of Dico buildings subject to the 1994 Order. Neither party sought the admission of testimony by Kramer into evidence in the bench trial on remand.

- Environmental Management and Engineering, Inc. ("EME") is a consulting firm retained by Cheri Holley to perform environmental consulting for the Dico site in 2005. Its headquarters are located in Nashville, Tennessee. Years prior to being hired by Holley to perform environmental consulting for the Dico site, EME performed work for Titan and Dico unrelated to the contaminated buildings that were the subject of the 1994 Order.

- Quintin MacDonald is the president of EME and worked as a consultant to Cheri Holley with respect to the

Dico site beginning in late 2004 or early 2005. Though the primary focus of this work pertained to the groundwater contamination at the site, MacDonald also participated in numerous communications and meetings with Holley and the EPA relating to the potential reuse or redevelopment of the Dico site. MacDonald was deposed and testified in person during the 2013 bench trial conducted in connection with this case, and the parties jointly designated portions of his prior sworn testimony for admission into evidence in the bench trial on remand. At the time of his testimony, the status of EME as a consultant with respect to the Dico site was in limbo, and EME had not performed any work for Dico for some time. Having previously had the opportunity to observe Mac-Donald's demeanor and having carefully considered his testimony in the context of the evidence of the whole, the Court finds he was generally credible as a witness. MacDonald was particularly direct and forthright in describing his own conduct and motivations, though his testimony occasionally conflicted with other evidence admitted at trial.

- Louis Barrentine was an employee of EME and worked as a consultant to Cheri Holley with respect to the Dico site beginning in early 2006. The primary focus of this work pertained to the groundwater contamination at the site, and Barrentine was responsible for the preparation of yearly performance reports concerning the groundwater extraction and treatment system and the asphalt cap. But like Quintin Mac-Donald, Barrentine also participated in several communications and meetings with Holley and the EPA relating to the potential reuse or redevelopment of the Dico site. While at EME, Barrentine regularly kept notes regarding meetings he attended, phone calls he participated in, conversations he had, and his other daily activities in a logbook. In addition, EME files pertaining to the Dico site were stored in a file cabinet in Barrentine's office. Barrentine was deposed in connection with this case in December 2011. At that time, Barrentine was still employed with EME,[5] and EME continued to perform consulting work for Dico. The Court finds Barrentine was generally not a credible witness. As the Court noted in its order on the 2013 bench trial, Barrentine's testimony regarding the key events changed significantly over the course of his deposition. Beyond its lack of internal consistency, the Court finds his testimony was also often implausible, imprecise, and inconsistent with documentary evidence admitted at trial.

- Fehr–Graham Associates ("Fehr–Graham") is a consulting firm retained by Titan Tire to provide environmental services to the Titan Tire facility in Des Moines and the Dico site.

- Brian Mills worked for Fehr–Graham as an environmental coordinator permanently assigned to the Titan Tire facility in Des Moines from August 2005 through October 2016, during which time Fehr–Graham was retained by Titan Tire to provide environmental consulting services to Titan Tire and Dico. As an outside consultant paid by Fehr–Graham, he had an office at Titan Tire and a Titan International email address,

---

5. Barrentine's employment with EME ended in late 2011 or early 2012.

and his primary responsibility was to ensure that Titan Tire and Dico maintained compliance with federal, state, and local environmental regulations. When Mills began working for Titan Tire, he was trained primarily by Brian Mersch, who was then a safety coordinator for Titan Tire. At that time, Mills inherited several binders and a drawer containing files pertaining to the Dico site from Mersch. Beginning in the fall of 2005, Mills spent approximately one day per week at the Dico site, where he performed duties relating to the groundwater contamination at the site such as obtaining meter readings, sampling, environmental reporting, and performing maintenance on the groundwater extraction and treatment system. In addition to these duties, Mills on occasion helped identify security breaches in the buildings subject to the 1994 Order and received documents pertaining to the Dico site, including a copy of the Reuse Planning Report issued by the EPA in March 2007. In October 2016, Mills was hired by Titan Tire to become its environmental manager. Mills testified in person during both bench trials and was deposed in connection with this case, and the parties jointly designated portions of his prior sworn testimony for admission into evidence in the bench trial on remand. Having had ample opportunity to observe Mills's demeanor and having carefully reviewed his testimony in light of the evidence of the whole and his relationship to the parties, the Court finds he was not a credible witness. Mills was often evasive and vague in responding to questions posed to him, and he testified as to events of which he was later revealed to lack independent knowledge. Additionally, his testimony was at times inconsistent with his own prior statements, other testimony, and documentary evidence admitted at trial.

- Ken Thompson worked for Fehr–Graham and supervised Brian Mills in providing environmental consulting services to Titan Tire and Dico. Neither party sought the admission of testimony by Thompson into evidence in the bench trial on remand.

- Brian Mersch is the former safety coordinator for Titan Tire. Mersch was involved in environmental maintenance at the Dico site until Brian Mills was hired as an environmental consultant for Titan Tire, at which point the environmental portion of his responsibilities transferred to Mills. Neither party sought the admission of testimony by Mersch into evidence in the bench trial on remand.

- Doug Pospisil was a mechanical engineer for Titan Tire who provided mechanical engineering services for Dico. Pursuant to a delegation of authority from Morry Taylor, Pospisil was authorized to perform work pertaining to environmental matters at the Dico site as directed by Bill Campbell through Cheri Holley. Pospisil attended at least one meeting with Hughes concerning SIM's purchase of Dico buildings subject to the 1994 Order. Pospisil also attended the site inspection for the fourth five-year review of the remedial actions taken at the Dico site where the EPA learned for the first time that buildings subject to the 1994 Order had been dismantled. Neither party sought the admission of testimony by Pospisil into evidence in the bench trial on remand.

• Gary Schuster worked for Dico from November 1968 through early 1994, served as an officer of Dico from 1991 through early 1994, and was a member of Titan Tire from July 1994 through sometime in 2004. Throughout the time Schuster was employed with Titan Tire, one of his responsibilities was protesting property tax assessments of the Dico property with the Polk County Assessor, a task that required him to explain environmental issues pertaining to the property. Schuster testified during a deposition on behalf of Dico pursuant to Federal Rule of Civil Procedure 30(b)(6) in April 2012, at which time he was employed by Titan Marketing Services. Schuster also testified during the 2013 bench trial, at which time he was employed by Titan International. The parties jointly designated portions of this prior sworn testimony for admission into evidence in the bench trial on remand. Having previously had the opportunity to observe Schuster's demeanor and having carefully considered his testimony in the context of the evidence of the whole and the basis for his knowledge as to matters to which he testified, the Court finds he was generally credible, direct, and clear to the extent his apparently limited preparation allowed.

The Court finds the following with respect to the events at issue in this suit. The Dico site is located at 200 Southwest 16th Street in Des Moines, Iowa, and is part of the Des Moines TCE Superfund Site, an area the EPA designated for inclusion on the National Priorities List ("NPL")[6] in 1983 following its investigation into the origin of volatile organic compounds ("VOCs") polluting the Des Moines water supply. *See* Ex. 26 at DICO-

TRANX000438; *see also* Ex. 178 at DICO-TRANX003394. Ultimately, the EPA determined the Dico site was the primary source of the VOC contamination, as industrial solvents containing trichloroethylene ("TCE") and other VOCs had previously been utilized in manufacturing processes on the Dico site. Ex. 26 at DICO-TRANX000438.

In 1986, the EPA initiated a removal action pursuant to which Dico installed a groundwater extraction and treatment system the following year. *See* Ex. 178 at DICOTRANX003394; *see also* Ex. 26 at DICOTRANX000438. However, the EPA subsequently discovered additional contaminants in the area, and the Des Moines TCE Superfund Site eventually came to be divided into four operable units ("OUs"). Ex. 7 at DICOTRANX000079. The area that came to be known as OU1 included the groundwater extraction and treatment system intended to address the historical VOC contamination in groundwater on the Dico site. The area that came to be known as OU3 involved groundwater contamination to the north of the Dico site on land not owned by Dico. And the areas known as OU2 and OU4 included several buildings on the Dico site where, among other things, the formulation of pesticides and herbicides had once occurred. The buildings located on the Dico site included a number of pre-engineered, portable "Butler-style" buildings consisting of a steel frame and metal sheeting with or without insulation. Among these Butler-style buildings were buildings known as the Weld Shop, the Maintenance Building, Buildings 4 and 5, the western annex of Building 3, and the northern end of the Production Building. Additionally, several non-Butler-style buildings were located on the Dico site, including an Office Building, Build-

6. *See* 40 C.F.R. Part 300, Appendix B.

ings 1 and 2, and the remainders of both Building 3 and the Production Building.

In 1989, Dico entered into an administrative order on consent with the EPA and agreed to conduct a remedial investigation and a feasibility study for the Dico site, the primary purpose of which was to gather site-specific information to facilitate the development of remedial alternatives with respect to contaminated groundwater. *Id.* at DICOTRANX000080–81. However, the initial phase of the remedial investigation identified pesticide contamination in soils adjacent to several buildings on the Dico site. *Id.* at DICOTRANX000081. Further investigation was performed to determine the nature and extent of contamination within and adjacent to the buildings. *Id.*

Dico hired Eckenfelder, Inc. ("Eckenfelder") to conduct further sampling and analysis of the building interiors, and Eckenfelder prepared a detailed report summarizing the results of its investigation ("Eckenfelder Report"), copies of which were sent to both Dico and the EPA on August 3, 1992. Exs. 228, 292. The Eckenfelder Report noted that analysis of sampling performed pursuant to its investigation detected the presence of pesticides in Buildings 1 through 5 and the Maintenance Building and the presence of PCBs in all those buildings except Building 1.[7] Ex. at 292 at DICOTRANX008290, DICO-TRANX008302–09, DICOTRANX008323. The report identified the adhesive that had been used to secure insulation in the buildings to its backing as the probable source of the PCBs. *See id.* at DICO-TRANX008294–95, DICOTRANX008325. It further noted that the highest concentration of PCBs discovered during the course of the investigation—29,000 parts per million—was found in a sample of ceiling insulation of Building 5. *Id.* at DICO-TRANX008306. Of more than thirty insulation samples analyzed from more than

ten locations throughout the sampled buildings, over 75% contained PCBs in concentrations exceeding fifty parts per million. *Id.* at DICOTRANX008306–07.

Consistent with the findings in the Eckenfelder Report, in March 1994, the EPA issued the 1994 Order, requiring Dico to address the contamination within the buildings, relying on its authority under 42 U.S.C. § 9606(a) of CERCLA to issue "such orders as may be necessary to protect public health and welfare and the environment." Among other findings, the order stated that PCB-contaminated insulation had been found on the walls and ceilings of Buildings 2 through 5 and the Maintenance Building. Ex. 7 at DICO-TRANX000083. To address the resulting threat to public health, welfare, and the environment, the order required Dico to submit for EPA approval a detailed work plan for a removal action during which it would "[r]epair, seal, and protect all building insulation and clean and seal all exposed interior surfaces, including the walls, ceilings and concrete floors" within the contaminated buildings. *Id.* at DICO-TRANX000087. Additionally, paragraph 31 of the order required Dico to submit to the EPA for approval a work plan for ongoing operation and maintenance ("O & M") addressing "actions necessary to ensure the protectiveness and integrity of the removal action, including long-term maintenance of all interior surface sealing, encapsulation of all building insulation and appropriate reporting including, at a minimum, submittal of a written report on an annual basis." *Id.* at DICOTRANX000088–89. The order expressly stated it was binding upon Dico, its "successors and assigns, and upon all persons, contractors, and consultants acting under or for" Dico and provided Dico's responsibilities thereunder would not be altered by "any change in ownership or

---

7. Other buildings on the Dico site were not sampled during the Eckenfelder investigation.

corporate status ... including, but not limited to, any transfer of assets or real or personal property." *Id.* at DICO-TRANX000079.

Notably, the building removal action did not cover other buildings on the Dico site, including both the Weld Shop and the Production Building. However, the EPA issued a separate administrative order requiring Dico to install an asphalt cap over a substantial portion of OU2 and OU4 and ensure its continued integrity in a removal action that came to be known as "the capping removal action."

Jim Fechter, corporate environmental engineer for Titan International, was tasked with the responsibility of developing the removal action work plan for O & M related to the remedial actions to be performed at the Dico site. Fechter drafted the work plan in consultation with both Dico and Titan personnel, including, among others, Cheri Holley and Don Brown. In developing the plan, Fechter relied on the Eckenfelder data, which he regarded as accurate. The work plan called for the cleaning and sealing of all interior surfaces in the buildings subject to the order, the repair or replacement of damaged insulation within those buildings, and the encapsulation of the insulation with epoxy paint. Fechter understood these measures were intended to address the presence of PCBs in insulation on the ceilings and walls and permit the use of the buildings without any resulting danger to human health or the environment. The work plan was submitted to the EPA in March 1994. Ex. 161. Fechter submitted an addendum to the work plan to the EPA on behalf of Dico, along with the first of many monthly progress reports he prepared addressing its implementation, on April 13, 1994. Ex. 293.

Throughout the implementation of the removal action work plan, Fechter oversaw the environmental contractors hired to perform the work described in the plan on behalf of Dico. During the implementation, Fechter worked with EPA personnel, including Glenn Curtis and Mary Peterson. Fechter also communicated regularly with Dico and Titan personnel, including Cheri Holley and Don Brown. Fechter prepared monthly reports regarding the progress of the building removal action, and these reports were reviewed by Holley prior to their transmission to the EPA. Exs. 293–95, 297–304. Meanwhile, Black & Veatch Waste Science, Inc. ("Black & Veatch") oversaw implementation of the work plan on behalf of the EPA, during the course of which the contractor submitted at least three written reports to the EPA documenting its oversight activities at the site along with field notes and photographs. Exs. 1177–79.

During the course of the removal action, damaged insulation that was not able to be repaired was removed and replaced. This resulted in removal of thirty-six 55–gallon drums of PCB-contaminated insulation that were disposed of as hazardous waste by means of incineration. But the amount of contaminated insulation that was removed was minimal (less than 5%) in comparison to the amount of contaminated insulation that remained, and the areas in which insulation was removed and replaced were scattered in random patches throughout the buildings.[8] After the insulation repair and removal process was complete, all the insulation was encapsulated under a thick epoxy paint, and the acid-washed floors were sealed with two coats of urethane.

While the remediation work was ongoing, Fechter prepared and revised the

---

**8.** In addition to this PCB-contaminated insulation, an insignificant amount of batt-type insulation that was not anticipated to contain

PCBs was removed and disposed of as non-hazardous waste without being tested for PCBs.

draft work plan for O & M of the remedial actions performed at the Dico site pursuant to directions from the EPA in compliance with paragraph 31 of the 1994 Order, with the understanding that the purpose of the operation and maintenance plan was to ensure the encapsulation remained an effective means of protecting human health and the environment from PCBs that would remain in the buildings following the removal action. On June 10, 1994, Fechter submitted the revised draft work plan that would ultimately be approved to the EPA along with a cover letter explaining the draft plan had been revised to address prior feedback Dico had received. Exs. 8, 162, 196. The revised draft work plan explicitly acknowledged the EPA had "issued an administrative order to address the contaminants present within the buildings" intended to "protect human health and the environment from the actual or threatened release of hazardous substances." Ex. 8 at DICOTRANX000117. In addition, it acknowledged "any event that causes significant damage to the structure of one of the six buildings" would constitute "an emergency event . . . that allows potential exposure [to hazardous substances] suddenly and in quantities that may be harmful to human health and the environment." Ex. 8 at DICOTRANX000124. Copies of the letter and the draft plan were also sent to Cheri Holley. Dico completed the remediation work required by the 1994 Order within the buildings subject thereto in early November 1994, leaving only confirmatory air sampling to be completed.

By this point, recognizing that contaminants had been left in place with respect to both the soil and the buildings on the Dico site and that the effectiveness of the remediation would likely deteriorate over time, the EPA had engaged Black & Veatch to assist its investigation into and selection of remedial alternatives to maintain or improve the long-term future risks of contaminate exposure at the site. Toward that end, Black & Veatch conducted a remedial investigation into the nature and extent of contamination at the Dico site, the purpose of which was to gather data to support the development and evaluation of remedial alternatives. Black & Veatch submitted its final remedial investigation report to the EPA on July 27, 1995. Ex. 252.

Following the remedial investigation, Black & Veatch conducted a feasibility study to analyze potential remedial alternatives for the Dico buildings against the nine criteria set forth in the NCP, one of which was cost. Of these criteria, two are threshold criteria a remedial action must meet in order to be considered a potential remedial alternative: namely, the remedial alternative must reduce risks to human health and the environment to acceptable levels and must comply with substantive requirements, regulations, limitations, and cleanup standards promulgated by federal, state, or local authorities. Black & Veatch identified and analyzed three potential remedial alternatives that met these threshold criteria for the contaminated Dico buildings. Those remedial alternatives included a "no action" alternative, a "limited action" alternative, and a "source layer removal/disposal" alternative. Though Black & Veatch screened "building removal/disposal" as a potential fourth alternative, it was withdrawn from further consideration based on its anticipated cost, which would have exceeded that associated with the source layer removal/disposal alternative. Black & Veatch analyzed in detail each of the remaining alternatives in terms of the NCP criteria, and that analysis involved consideration of their potential capital and long-term costs as well as their long-term effectiveness. The results were summarized in their final report on the feasibility study ("Feasibility Study"), a copy of which was provided to the EPA on May 23, 1996. Ex. 253.

The Feasibility Study clearly summarized the current contaminant levels within the buildings and expressly stated that PCB contamination remained in insulation in the buildings. It further indicated that the epoxy coating applied to the insulation did not permanently eliminate the potential for the release of PCBs within the buildings and that the EPA anticipated its effectiveness would deteriorate over time.

The Feasibility Study was clear that its purpose was to evaluate remedial alternatives to reduce or maintain risks at or below acceptable levels for *industrial use* of the site and that further evaluation would be necessary before the site could be used for recreational or residential purposes. The limited action and no action alternatives analyzed in the Feasibility Study involved maintenance of the response actions already taken and periodic reviews with or without the implementation of land use restrictions on the site. In contrast, the source layer removal/disposal alternative involved the removal and disposal of sources of contamination within the buildings by means of removing the PCB-contaminated insulation and grit

blasting or scarifying the pesticide-contaminated concrete. The Feasibility Study recognized this alternative would remove only a majority of the contamination within the buildings. Thus, it expressly anticipated "the magnitude of the residual risks would need to be evaluated through air monitoring and sampling after" the source layer removal/disposal alternative was implemented. Ex. 253 at DICOTRANX07148. As such, the cost estimate did *not* account for costs that might be associated with residual PCB contamination on interior building components remaining after the removal of the PCB-contaminated insulation.

The Feasibility Study estimated the total costs associated with the source layer removal/disposal alternative to be approximately $2,824,600. *Id.* at DICOTRANX07151. But these costs included various components, only some of which were relevant to the cost of removal and disposal of the PCB-contaminated insulation. Cost components included in Table E-3 of the final report included the following estimates for direct costs relevant to removal and disposal of the contaminated insulation:

| Estimated Direct Costs for Disposal of Insulation | Cost in 1996 dollars |
|---|---|
| **Removal of insulation** (227.687 square feet of insulation at $0.56 per square foot) | $127,505 |
| **Loading insulation into roll-off containers** (2811 cubic yards at $1.13 per cubic yard) | $3176 |
| **Transport to offsite facility** (88 truck loads at $4800 per load) | $422,400 |
| **Disposal cost** (2811 cubic yards at $150 per cubic yard) | $421,650 |

*Id.* at DICOTRANX07264–67. The total cost estimate for the source layer removal/disposal alternative included various contingencies the EPA customarily accounts for when estimating the cost of remedial actions. They included bid contingencies (15%) and scope contingencies (15%) applied to the subtotal for all di-

rect costs, followed by contingencies for permitting and legal costs (5%) and construction services (10%) applied to the successive subtotal, and then by engineering design costs (8%). *See id.*

On May 30, 1996, the EPA issued the Feasibility Study to Dico. The EPA also made the final report accessible to the

public as part of its administrative record on the building removal action at both the Des Moines Public Library and its regional office, and notice of the availability of that record to the public was advertised in the local newspaper. *See* 400 C.F.R. § 430. Fechter thereafter became familiar with the contents of the Feasibility Study— including the fact that tearing down the buildings was identified as a potential remedial alternative therein—and discussed them with other Dico employees. Within weeks of the issuance of the final report, on June 11, 1996, a public meeting was held regarding the selection of a remedial action for OU2 and OU4.

On December 17, 1996, the EPA issued the Record of Decision ("Record of Decision") for OU2 and OU4 setting forth the cost estimates for each remedial alternative analyzed in the Feasibility Study and selecting the remedy to be implemented from among those alternatives at the Dico site. Exs. 1118, 2042; *see* 40 C.F.R. § 300.430. The Record of Decision indicated the source layer removal/disposal alternative was estimated to involve capital costs of $2,824,600 with annual O & M costs of $1000 to $13,900. Ex. 1118 at DICOTCE–009167. In contrast, it indicated the no action and limited action alternatives for the buildings were estimated to involve no capital costs and $5000 in capital costs, respectively, and annual O & M costs of $31,900 to $53,900. *Id.* at DICOTCE–009166–67. Accordingly, the limited action alternative, which involved maintenance of the response actions already taken and periodic reviews with the implementation of restrictions on use of the site, was selected as the remedy to be implemented going forward. Concerning the remaining risks present, the Record of Decision indicated response actions already taken had "reduced risks creating an acceptable risk for industrial use of OU2 and OU4 provided the maintenance activities

required by the response actions are conducted." *Id.* at DICOTCE–009165.

On April 23, 1998, the EPA sent a special notice letter to Cheri Holley via certified mail. Exs. 323, 2001. Consistent with EPA standard practice, the special notice letter was accompanied by a copy of the Record of Decision. The special notice letter contained both a demand for response costs incurred and an invitation to negotiate a settlement between Dico/Titan and the EPA concerning the implementation of the response action. It also advised that Dico "may wish to review" the administrative record available for viewing at the Des Moines Public Library prior to responding. Ex. 323 at DICOTRANX008962.

Dico did not respond to the invitation to negotiate regarding the demand for response costs. However, there is no question Dico received the Record of Decision and was aware of the cost estimates it contained. For example, Dico later submitted comments and objections to a consent decree entered into between the EPA and other parties involved with the Des Moines TCE Superfund Site, citing the section of the Record of Decision containing the cost estimates for the remedial alternatives considered for the buildings as evidence of the remediation costs it had incurred. Ex. 322 at DICOTRANX008826.

Following the announcement of the selection of the remedial action, in February 1997, Peterson sent Dico a letter in which she approved the previously submitted draft operation and maintenance plan on behalf of the EPA and confirmed the EPA was satisfied with the results of prior air sampling. Ex. 9. The letter indicated the EPA anticipated issuing a notice confirming the completion of the removal action upon receipt of the removal action final report from Dico. It cautioned, however, that the issuance of that notice "would not alter ... the continuing obligations" set

forth in the 1994 Order, including the post-removal activities required by paragraph 31. *Id.* Thereafter, Fechter prepared the draft removal action final report, which Cheri Holley reviewed prior to its submission to the EPA. Dico submitted its removal action final report ("the 1997 Final Report") to the EPA on April 11, 1997. Exs. 10, 10R, 179.

Peterson reviewed and approved the 1997 Final Report on behalf of the EPA, and the EPA issued its notice of completion on May 8, 1997. Ex. 11. The notice of completion expressly stated that its issuance did not alter the continuing obligations that existed under the 1994 Order, including the post-removal activities required by paragraph 31 and the annual reporting obligations described in the operation and maintenance plan. *Id.* Four days after its issuance, on May 12, 1997, Fechter wrote a memo to Cheri Holley and Mike Samide [9] and provided them copies of the notice of completion, and copies of both the memo and the notice of completion were provided to Brown. Ex. 12. In the memo, Fechter acknowledged the notice of completion marked the completion of the removal action and stated that Dico was now "free to use the buildings without any stipulations from the EPA (with the exception of on-going maintenance and upkeep of the paint job)." *Id.* When he testified during his deposition, Fechter acknowledged he recognized the notice of completion issued to Dico upon EPA approval of the 1997 Final Report did not terminate Dico's obligations under the 1994 Order.

Consistent with Dico's continuing obligations under the 1994 Order, Fechter conducted an annual inspection of the buildings in January 1998 and prepared the 1997 annual report, which he sent to the EPA via certified mail the same month with copy to Cheri Holley. Ex. 168. In an accompanying letter, Fechter acknowledged the buildings were still in use and noted Dico planned to touch up worn floor paint in the spring when the weather would allow.

Later that year, Fechter ended his employment with Titan International, and Thomas Duncan became the corporate environmental compliance manager for Titan International and assumed the responsibility of overseeing O & M activities at the Dico site. Duncan conducted the next annual inspection of the buildings in January 1999 and sent the 1998 annual report to the EPA on January 14, 1999, with copies to Cheri Holley, Morry Taylor, and Bob Buss.[10] Ex. 169. In a letter accompanying the report, Duncan stated that several areas of concern noted during the inspection would be addressed in the spring or summer when the warmer weather would allow for touch-up painting. On January 19, 1999, Morry Taylor wrote a note addressed to Gary Carlson [11] and Phil Stanhope [12] on a copy of the cover letter and annual report Duncan sent to the EPA. The note stated, "Who ever is in charge of these facilities should see these things are done. EPA are nuts, but we agreed." *Id.* at DICOTRANX003191.

Duncan conducted another annual inspection of the buildings the following year, sending the 1999 annual report to the EPA in the summer of 2000 via certified

---

9. Fechter was unable to recall whether Samide was an officer of Dico or vice president of Titan International in May 1997, but Samide served in both roles at one time or another.

10. Buss is a former supervisor for Dico.

11. At the time, Carlson was the president of Titan Tire. Carlson was later replaced as president of Titan Tire by Campbell in 2001.

12. At the time, Stanhope was in a leadership position at Titan Distribution. The Court notes that Stanhope's precise title is not clear from the record.

mail with copies to Cheri Holley and Bob Buss. Exs. 90, 170. In accordance with periodic testing requirements in the operation and maintenance plan, which required wipe samples collected from coated surfaces on the walls, floors, and ceilings to be tested for specified contaminants on a biannual basis, Duncan enclosed reports summarizing the results of laboratory analyses of wipe samples collected from the buildings with the 1999 annual report. In a cover letter accompanying the annual report, Duncan noted that only two of the wipe samples had tested above detection limits for any contaminant that was screened for and stated that areas of concern noted during the inspection would be addressed in the summer or fall.

That same summer, Dr. Gazi George, who had previously advised Titan International with respect to its purchase of the Dico site in 1992 or 1993, was retained by Cheri Holley as an environmental consultant for Titan International and Dico. George reported to and received directions from Holley, who tasked him with fulfilling the O & M obligations at the Dico site. In connection with that task, George reviewed the 1994 Order, familiarized himself with the operation and maintenance plan, and conducted the next annual inspection of the buildings in April 2002. George understood that the O & M obligations for the buildings subject to the 1994 Order included inspecting them for deteriorating insulation and breaches in the epoxy encapsulation, conducting wipe testing, and maintaining the integrity of the encapsulation. As the person responsible for fulfilling those obligations on behalf of Dico, George communicated frequently with Peterson by phone, email, and letter.

Holley regularly reviewed and edited the written correspondence George sent to the EPA, however, and George did not call the EPA without Holley's approval.

On April 15, 2002, George sent the 2001 annual report to the EPA, with copies to Cheri Holley and Bob Buss. Ex. 171. George acknowledged in the cover letter accompanying the report that "some deterioration" within the buildings had taken place and indicated that necessary maintenance would be addressed in the spring and summer. *Id.* at DICOTRANX003270. The report itself detailed the significant maintenance needed in each of the six buildings subject to the 1994 Order.

The same year, the EPA contracted with Black & Veatch to perform the third five-year review [13] of the remedies implemented at the Des Moines TCE Superfund Site. Toward that end, Black & Veatch contractors visited the Dico site in October 2002 to perform a site inspection, during which they were accompanied by Brown. During the course of the inspection, Brown and the contractors discussed the operation and maintenance plan requirements for the buildings.

Also during 2002, in response to receiving notification from the City of Des Moines that it desired to construct a highway across the northern portion of the Dico property, the EPA engaged Dico in discussions about closing some of the monitoring and extraction wells associated with the groundwater contamination in OU1. During those discussions, the EPA expressed its willingness to modify the O & M requirements associated with the remaining wells to help Dico reduce its operating costs. However, Dico was also inter-

---

**13.** "Where hazardous substances, pollutants, or contaminants remain on site above levels that would allow for unlimited use and unrestricted exposure, EPA conducts reviews at least every five years to ensure that the reme-

dy remains protective." Ex. 178, at DICO-TRANX003414 (quoting an EPA guidance document entitled "Reusing Superfund Sites: Commercial Use Where Waste is Left On-site").

ested in reducing its costs with respect to the O & M requirements for the buildings subject to the 1994 Order, given it had already ceased manufacturing operations within them and was using them almost exclusively to warehouse inventory. In particular, Dico was interested in the possibility of modifying the inspection and testing requirements that were part of the operation and maintenance plan for the buildings.

On December 3, 2002, George responded by letter to correspondence Dico had received from Peterson the month before regarding potential modifications to the ongoing remedial activities. involving the groundwater monitoring and extraction well network. Exs. 277, 310. In the letter, which was approved by Cheri Holley before it was sent, George listed the wells the EPA had agreed could be closed or temporarily shut down and briefly recounted previously agreed-upon modifications to the sampling and testing protocols associated with the groundwater contamination. The letter indicated that Dico intended to prepare a revised work plan incorporating these changes. Moreover, the letter for the first time broached the possibility of modifying the O & M requirements applicable to the Dico buildings in OU4 with the EPA. Indeed, in a separate section addressing only the buildings, Dico formally requested that the EPA release Dico from the existing building inspection and testing requirements. In support of this request, the letter noted the Dico site was no longer an operational site and stated the buildings were "being evacuated of any products stored and only one office area (not covered by the O & M) [was] being used for security and site coordinator." Ex. 277 at DICOTRANX007857. Copies of the letter, which was addressed to Peterson at the EPA, were sent to Morry Taylor, Cheri Holley, and Stanley Reigel, outside counsel to Holley. Also copied on the letter was Dan Buttars, an employee of Titan

Tire who was then serving as the environmental coordinator for Dico.

On December 31, 2002, Black & Veatch submitted to the EPA its report concerning the third five-year review of the remedies implemented at the Des Moines TCE Superfund Site. Ex. 276. In the report, Black & Veatch noted the building encapsulation and soil capping remained "protective for industrial uses of the buildings and properties" but cautioned that "in order for the remedies to be protective in the long term, continued inspections, maintenance, and implementation of institutional controls" would be necessary. *Id.* at DICO-TRANX007467.

On January 29, 2003, the EPA responded to the letter from Dico regarding the proposed modifications to the ongoing remedial activities involving the buildings and the groundwater monitoring and extraction well network. Ex. 213. In the response, the EPA expressed its willingness to modify the O & M requirements applicable to the buildings, with caveats. The response stated,

> Given the diminished use of the buildings, EPA agrees that less frequent inspections are needed, but EPA does not agree to completely discontinue the O & M of the buildings. At a minimum, EPA will require an annual report (letter) from Dico verifying the use of the buildings. So long as the buildings remain unused, EPA will not require further inspection or repairs. However, if Dico resumes operations inside the buildings, any repairs necessary to bring the buildings into usable condition under the terms of the order must be made before the buildings are occupied and the O & M requirements will be reinstated.

*Id.* at DICOTRANX004160. In closing, the response clearly indicated it was intended only to assist Dico in the preparation of a revised work plan incorporating the pro-

posed modifications and addressing their implementation, not as a final approval of the proposed modifications or authorization for Dico to implement them. On February 4, 2003, George sent a letter to the EPA acknowledging its response to the proposed modifications to the ongoing site remedial activities and indicating he was working with Buttars to draft a new work plan incorporating the O & M changes the EPA had approved. Ex. 311.

On April 17, 2003, Buttars sent the EPA via certified mail a proposed revised work plan for modifications to the ongoing remedial activities at the Dico site that he and George had prepared. Exs. 163, 214R. Cheri Holley reviewed the proposed revised work plan prior to its submission to the EPA, and copies of the proposed revised work plan were distributed to George, Brown, and Buttars's supervisor at Titan Tire, Jeff Kramer. Ex. 163 at DICOTRANX003161. With respect to the buildings, the proposed revised work plan stated simply, "The EPA will be sent an annual report from Dico verifying that the buildings have remained unused. If operations resume inside the buildings, Dico will resume the O & M requirements." *Id.* at DICOTRANX003160–61.

Peterson did not approve the proposed revised work plan Dico sent to the EPA on April 17, 2003. Rather, Peterson sent a letter to Dico on behalf of the EPA providing comments on the proposed plan on May 21, 2003. Exs. 164, 215. With respect to the proposed modifications to the remedial activities associated with the buildings, the letter indicated the revised work plan should clearly state the conditions under which existing O & M requirements would resume and identify the rationale for modifying those requirements. And given that Dico had not submitted an annual report concerning the buildings since April 15, 2002, the letter also indicated the next annual report should be submitted to the EPA by July 31, 2003. Though the letter

was addressed to George, copies were circulated among other individuals responsible for ongoing remedial activities at the Dico site, including Brown and Buttars. *See* Ex. 164 at DICOTRANX003166.

On July 2, 2003, Buttars sent the EPA a second proposed revised work plan for modifications to the ongoing remedial activities at the Dico site. Exs. 14, 165. With respect to the buildings subject to the 1994 Order, the revised work plan stated,

Operable Unit 4 Building Removal Action

This system is operating under the guidelines of the following documents:

USEPA Administrative Order Docket No. VII–94–F–0017

Operation and Maintenance Plan, 10 June 1994

11. The interior surface coating maintenance for Buildings 1, 2, 3, 4, 5, and the Maintenance Building at the Des Moines TCE site is very costly and time consuming. At the end of 2001, all manufacturing operations were shut down and the buildings were vacated. On the date of this work plan, some inventory remnants remain in the Maintenance Building and Buildings 3, 4, and 5. One man is currently working on a weekly basis to remove these remnants of inventory.

DICO has intentions of possible future demolition or dismantling of these buildings. No date of certainty can be given for this, however.

It is proposed to discontinue the requirements of the Operation and Maintenance Plan of 10 June 1994. This is based on the fact the buildings are not being used for manufacturing activities, the cost associated with the upkeep, and there is no occupancy of people to perform the work. The only people visiting the site are for the sampling, monitoring, and maintenance requirements of OU1 and OU4 Capping Removal Action,

and the one person mentioned in 13 above.

The effective date would be the date of approval of this work plan.

12. Reporting requirements would be for DICO to send the EPA an annual report verifying that the buildings have remained unused for any manufacturing activities, and give the status of any remaining inventory.

13. If operations resume inside the buildings, DICO will notify the EPA of its intentions prior to resuming operations, and resume the O & M requirements of the 10 June 1994 [sic] prior to resuming operations.

14. The annual report due for OU4 (Building) will [sic] completed before 31 July of the following year.

Ex. 165 at DICOTRANX003174–75. This marked the first time Dico had informed the EPA it was potentially interested in removing the buildings from the Dico site.

As the EPA had instructed in its May 2003 letter, Brown and Buttars conducted an annual inspection of the buildings and prepared the 2002 annual report in July 2003. Exs. 172, 209. Buttars sent the report along with a cover letter to the EPA on July 25, 2003. Though wipe sampling in the buildings had last been conducted in May 2000, *see* Ex. 90 at DICO-TRANX001460–1523, the cover letter accompanying the report indicated wipe sampling had not been conducted in the buildings as they were not inhabited by employees. Ex. 172 at DICO-TRANX003279. Prior to sending the report, Buttars had communicated with Peterson via voicemail to inquire whether wipe sampling was necessary. Peterson had responded via email indicating that so long as Dico stated what the buildings were being used for and confirmed work-

ers were not routinely inhabiting the buildings in the annual report, wipe sampling was not necessary as they would not be inhabited. Ex. 157 at DICO-TRANX003002. Thus, the report confirmed that personnel and equipment storage were no longer permitted in the buildings,[14] and the accompanying cover letter stated the buildings were not inhabited by employees. Ex. 172. In anticipation of the EPA's approval of the revised proposed work plan, the cover letter did not state Dico had plans to maintain the remedial actions taken in the buildings, even though the report indicated damage to those actions existed in each of the buildings. *See id.* Holley and George each received copies of both the report and cover letter, and Brown received a copy of the cover letter. *Id.* at DICO-TRANX003279.

On September 3, 2003, Peterson conditionally approved the second proposed revised work plan for modifications to the ongoing remedial activities at the Dico site on behalf of the EPA. Exs. 16, 166, 192; *see* Ex. 15. Concerning the buildings, the letter approving the revised work plan stated,

> The work plan mentions that Dico may demolish the buildings which are associated with previous response actions and subject to certain requirements for operation and maintenance. The EPA does not necessarily object to demolition of the buildings, but urges Dico to coordinate any plans for demolition of the buildings with EPA. Certain disposal requirements may apply for building debris, and the EPA or state would want to oversee the demolition.

Ex. 192 at DICOTRANX003180. Days later, George wrote Buttars a note on a copy

---

**14.** Prior to 2003, Dico allowed Titan Distribution to store inventory in the buildings on the Dico site without paying for their use.

of the approval letter instructing him to thank Peterson for approving the revised work plan and confirm that Dico would inform the EPA before demolishing, improving, or using the buildings. *Id.* at DICOTRANX003738. The note stated,·

Implement Immediately

Dan

Send a letter to Mary thanking her for the approval then tell her that Dico will inform USEPA of any site activity regarding demolition, improvement, +/or at least one to two weeks by phone + writing.

*Id.*

As instructed by George, Buttars sent Peterson a letter of acknowledgment via certified mail on September 23, 2003, thanking her on behalf of Dico for the approval of the revised work plan. Exs. 158, 167, 193. Also as instructed, the letter stated,· "Dico will notify the EPA by phone and writing at least one week prior to any future site activity regarding building dismantling or demolition, improvements, and/or re-use." Ex. 158 at DICO-TRANX003004.

The following year, on July 23, 2004, Buttars sent the 2003 annual report in the form of a letter to the EPA. Ex. 173. The letter stated, "The buildings remain unoccupied for any manufacturing or warehousing activities. The entire inventory has been moved out. The only items that remain are some pieces of miscellaneous production machinery." *Id.* at DICO-TRANX003287. Copies of the report were distributed to Holley, Brown, and Kramer. *Id.*

That same year, in September 2004, Dico entered into a transaction to sell its Weld Shop, a Butler-style building on the Dico site that was not subject to the 1994

Order, to SIM, a mechanical maintenance contractor who had continuously performed work for Titan Tire. The transaction was recorded in the books for Titan Distribution as a fixed assets disposal involving the sale of a 10,000–square-foot Dico building for $10,000 in cash on September 24, 2004. Exs. 1030, 2063. The sale proceeds were then transferred to Dico via intercompany accounting.

The Weld Shop transaction came about after Jim Hughes, president of SIM, spoke with Brown about the possibility of purchasing the 10,000–square-foot building during the course of performing on-site industrial maintenance and repair work at the Titan Tire facility in Des Moines. Thereafter, Brown approached Bill Campbell, president of Titan Tire, about the possibility of Dico selling the Weld Shop to SIM.

By the time Brown approached Campbell about the possibility of selling the Weld Shop to SIM in 2004, Campbell had been the highest ranking Titan official in Des Moines for approximately three years. Throughout that time, Campbell had been constantly approached by entities interested in purchasing and redeveloping the Dico property. For example, Campbell had been approached by developers interested in building a casino or an amphitheater on the site. In addition to individual developers, the City of Des Moines had expressed interest in the redevelopment of the property and approached Campbell on behalf of other potential developers.[15] Meanwhile, as the president of Titan Tire, Campbell spoke frequently with Morry Taylor, president of Dico. In fact, beginning early on in his tenure as Titan Tire president, Campbell had frequent conversations with Taylor, some of which concerned the possibili-

---

**15.** At some point, Dico offered the City of Des Moines the opportunity to acquire the Dico site as a charitable donation in exchange for a ten-year property tax abatement for Titan International and a six-million-dollar charitable tax deduction, but the City declined.

ty of redeveloping of the Dico property. And Campbell found Taylor eager to entertain any redevelopment proposal concerning that property.

By 2004, the conversations between Taylor and Campbell had led Taylor to delegate significant authority to Campbell with respect to the Dico property. The first significant aspect of this delegation of authority involved responsibility for the performance of environmental work at the Dico site, including the performance of O & M activities pursuant to the 1994 Order. In particular, Taylor instructed Campbell to use Titan Tire employees or contractors at his discretion for the performance of such activities at the Dico site.[16] Thus, employees performing environmental work pursuant to the 1994 Order were either directed by Campbell, who learned of specific tasks to be performed from Cheri Holley, or directed by Holley herself. The second significant aspect of this delegation of authority concerned the sale of the buildings. Specifically, Taylor granted Campbell the authority to sell the buildings on the Dico property on behalf of Dico.

It was pursuant to this latter delegation of authority that Campbell authorized the sale of the Weld Shop to SIM. After Brown approached Campbell with the information that Hughes was interested in buying the Weld Shop, Campbell informed Holley of his intention to sell the building to Hughes and agreed upon the price of $1 per square foot with Hughes. Taylor was not involved in negotiating the price and did not approve it, as those tasks were within the scope of the authority he delegated to Campbell. Rather, Campbell had complete authority to authorize the sale on

Taylor's behalf and could have sold the building for any price.

Brown and Campbell knew that Hughes was purchasing the building with the intention to dismantle it on the Dico site, transport the underlying steel structure to the SIM site in Ottumwa, discard the remaining building materials as waste, and reconstruct the steel structure for use in his mechanical maintenance contracting operations. Given his intended use for the Weld Shop on his own property, Hughes would not have purchased it had he believed it to be contaminated with PCBs. Still, Hughes never inquired as to whether there were any environmental issues with the building, never conducted any inquiry into its environmental status, and never consulted with an environmental or demolition expert prior to purchasing or dismantling it, despite his personal awareness that the building was located on a Superfund Site. Rather, given his longstanding relationship with Titan Tire and the corporate connection between Titan Tire and Dico, Hughes trusted he would have been told of any environmental contamination in the building, if any had existed. After all, Hughes had an extensive history with Titan Tire, having performed work for them for nearly ten years as a mechanical maintenance contractor and billed them between $600,000 and $900,000 annually during that period.

Following the September 2004 purchase, SIM dismantled the Weld Shop. Given that SIM was a mechanical maintenance contractor, not a demolition contractor or consultant, SIM dismantled the Weld Shop without obtaining any demolition or disposal permits. Thereafter, SIM transported

16. According to Gary Schuster, who testified on behalf of Dico pursuant to Federal Rule of Civil Procedure 30(b)(6), Dan Buttars also worked on the Dico property by virtue of a delegation of authority from Morry Taylor from 2000 to 2004. Thus, Morry Taylor presumably delegated similar authority to Gary Carlson, who was president of Titan Tire before Bill Campbell assumed the position in 2001.

the steel beams making up its frame to Ottumwa, disposed of the remaining building materials including the metal sheeting that had covered the roof and sides, and reassembled the structure on the SIM Site.[17]

Meanwhile, September 2004 marked the end of a lengthy environmental investigation unrelated to the Dico site, one that culminated in George pleading guilty to two environmental felonies before a federal district court in Michigan. Ex. 1129. On September 24, 2004, George pled guilty to knowingly violating a requirement of a water pretreatment program approved by the EPA in violation of the Clean Water Act, 33 U.S.C. § 1319(c)(2)(A), and knowingly causing another to transport hazardous waste to a landfill that lacked a permit to accept it in violation of the Resource Conservation and Recovery Act, 42 U.S.C. § 6928(d)(1) in connection with his work as an environmental consultant for City Environmental Contracting between the fall of 1992 and the fall of 1999. Id. at DICO-DOJ010676–77. Pursuant to the plea agreement, the United States agreed to seek a sentence of twenty-seven to thirty months' incarceration followed by a term of supervised release. Id. at DICO-DOJ010680.

With his sentence looming on the horizon, George helped Cheri Holley secure a new team of environmental consultants to assist Dico while he was incarcerated. In late 2004 or early 2005, George contacted Quintin MacDonald, president of EME, an environmental services contractor based in Nashville, to let him know that he was recommending EME to assist Holley in his absence. In addition to EME, George recommended to Holley a second environmental consulting firm, Fehr–Graham, to provide consulting services to Dico.

Just before George began serving his prison sentence, Holley retained EME to provide environmental consulting services to Dico, and MacDonald and Holley met at the corporate office for Titan International in Quincy, Illinois. There, they reviewed files containing documents pertaining to the Dico site. Because the bulk of the O & M requirements associated with the buildings had been placed on hold pursuant to the revised work plan, and given that the buildings were no longer operational, the primary focus of that review was documents related to groundwater contamination at the site. Nonetheless, the revised work plan itself referred to the 1994 Order, and it contained updates to the operation and maintenance plans associated with the groundwater contamination and the building contamination at the site. MacDonald later acknowledged he may have also looked at the Record of Decision and the Feasibility Study.

When George began serving his sentence in mid-May 2005, MacDonald became the primary consultant responsible for performing environmental consulting work pertaining to the Dico site. And in light of the revised work plan and the non-operational status of the buildings, the primary focus of his work was initially the groundwater contamination at the site. In his capacity as the new chief environmental consultant for Dico, MacDonald sent the next annual report for the buildings covered by the 1994 Order to the EPA on July 29, 2005.[18] Ex. 210. The report stated,

---

17. As the Weld Shop had not contained any insulation prior to its deconstruction and was never subject to the 1994 Order, the steel structure remains in use on the SIM site as a fabrication shop and a clean room for vitamin E barrels.

18. The report stated it covered "Buildings 1, 2, 3, 4, 5, and the maintenance building at DICO for the year ending 2005." See Ex. 210. Obviously, the year 2005 had not yet ended when the report was sent.

The buildings remain unoccupied for any manufacturing or warehousing activities. The entire inventory has been moved out. The only items that remain are some pieces of miscellaneous production machinery. In addition to existing perimeter fencing and locked, onsite security and surveillance services are scheduled to return to the premises to discourage vagrants and/or trespassers.

*Id.* Cheri Holley was involved in the preparation of the report and received a copy of the final version sent to the EPA.

Titan Tire soon thereafter retained Fehr–Graham to provide additional consulting services with respect to both Titan Tire and the Dico site. In August 2005, Brian Mills of Fehr–Graham became the full-time environmental coordinator for the Titan Tire facility in Des Moines and was assigned an office in that facility and given a Titan International email address. As the environmental coordinator for Titan Tire, Mills was responsible for compliance with federal, state, and local regulations. To that end, Mills spent approximately one day per week at the Dico site beginning in the fall of 2005 and was responsible for maintaining the groundwater extraction and treatment system at the site. Finally, Mills was responsible for inspecting the asphalt cap, environmental reporting,[19] sampling, and recording meter readings in connection with the groundwater extraction and treatment system, and he walked through the buildings on the site to identify security breaches that frequently occurred when homeless persons or vandals broke into them.[20]

When Mills started working for Titan Tire, he was trained in connection with his duties at the Dico site by Brian Mersch, safety coordinator for Titan Tire, from whom he inherited numerous files pertaining to the Dico site. Among these files were several documents pertaining to *both* the groundwater contamination and the building contamination. Those documents included the revised work plan referencing the 1994 Order, the EPA letter approving the revised work plan, and the letter acknowledging the EPA approval of the revised work plan in which Dico indicated it would notify the EPA of any change in the status of the buildings. Moreover, Mills knew when he began working on the Dico property that it was located on a Superfund Site.

Around the time Mills was settling into his new role as an environmental consultant, MacDonald accompanied EPA inspector Jack Robertson[21] on a site visit to the Dico property in Des Moines. During the site visit, MacDonald observed placards in the buildings indicating they should not be occupied, and those placards alerted him that there was some sort of environmental contamination within the buildings. Seeing the placards and the buildings boarded up for security purposes, MacDonald perceived that having people inside the buildings was highly undesirable to the EPA. During the site visit, MacDonald shared his view with Robertson that the current

19. For example, Mills prepared monthly progress reports sent to the EPA and monthly monitoring reports sent to the Iowa Department of Natural Resources in connection with the National Pollutant Discharge Elimination System. In addition to these reports, EME prepared annual performance evaluation reports sent to the EPA in connection with the groundwater extraction and treatment system and the asphalt cap at the Dico site.

20. Mills's work with the groundwater extraction and treatment system required him to regularly enter the Production Building, which housed its control room. The security walkabouts were separate from his work with that system.

21. The Court notes that Robertson's precise title is not clear from the record.

groundwater extraction and treatment system was highly inefficient. And he left the site visit hopeful that the EPA might be willing to work toward closing out that system, which he believed was nearing the end of its life cycle and overly costly to maintain, particularly in light of its diminishing effectiveness.

Following the site visit, on September 8, 2005, MacDonald sent an email to Peterson and Robertson at the EPA. Ex. 202. In the email, MacDonald indicated he was writing to float the possibility of redeveloping the Dico site, noting that from his vantage point, the site appeared to be ideally situated for a Brownfield development initiative. In the email, MacDonald wrote,

I realize that there are numerous remaining environmental issues at the site and that any re-development conducted must be protective of human health and the environment, but I wanted to get your thoughts on the concept so I can either put my thoughts aside or refine them a little going forward. I guess you can call this an unofficial, informal trial balloon e-mail. I don't want to put the thought in my client's mind unless you guys think it might have wings or could be an appealing option. To be honest, I have no idea what my client would think of such a suggestion. It might be of interest to them or they may reject it completely. So, I decided to start with you two to first get my footing from your thoughts.

*Id.* With this background, MacDonald then listed several questions for Peterson and Robertson. For example, MacDonald asked, "Are there any regulatory and/or existing legal agreements regarding the site that might preclude [Brownfield] redevelopment from being an option at this site?" *Id.* In closing, MacDonald acknowledged that redevelopment of the site was "not necessarily a painless or inexpensive solution." *Id.*

By the fall of 2005, homeless persons and vandals had begun regularly breaking into the buildings on the Dico property. On September 12, 2005, MacDonald sent an email addressed to Cheri Holley to her assistant to alert her to this "persisting and worsen[ing] issue at the DICO site." Ex. 327. In the email, MacDonald described the buildings as being inhabited by homeless persons and significantly damaged by looting,

Vagrants and vandals are making a claim to the property. All of the buildings have been opened up and they are now living quarters for a growing population. Obviously, this raises some significant concerns. First, they are ripping apart the buildings, stripping wires and generally creating a lot of damage. Recently they stripped the wiring from the control system for the groundwater pump and treat system.... Second, they are living in the buildings which are supposed to be restricted. With the USEPA beginning to view this site in a new light, possibly allowing further reduction in operation or even shutting down of the system, it would be a bad thing if that positive progress were to get side track[ed] over the buildings. Third, the vagrants are destroying the place. Left unchecked there will be no copper or valuable metals left in the place. Anything that has a recycle value will be removed. Fo[u]rth, the vagrants are uncontrolled and are fairly aggressive. The security of onsite workers could become [an] issue. They clearly have made claim to the property.

*Id.* Thus, MacDonald framed the situation to Holley not only as one concerning cost and the safety of onsite employees but also as one that might undermine the possibility of future redevelopment of the site were it to come to the attention of the EPA. MacDonald further advised Holley that he believed securing the site would require

"heavy duty security" twenty-four hours per day in addition to having carpenters close the openings that had been made in all the buildings. *Id.*

The following month, MacDonald received a response to his "trial balloon" email broaching the possibility of redevelopment of the Dico site with the EPA. On October 25, 2005, Peterson wrote to MacDonald that the EPA was generally "agreeable to the notion of redeveloping the site, provided that the environmental concerns are addressed through long term operation and maintenance or additional cleanup measures." Ex. 31 at DICO-TRANX000536. With respect to funding, however, Peterson noted that because the Dico property was part of an NPL site, it was not eligible for redevelopment funding from the EPA through its Brownfields Program. *Id.* Furthermore, Peterson pointed out that while limited funding may be available under the Superfund Reuse Initiative to evaluate redevelopment options for the Dico site, that funding could not be used for actual redevelopment. *Id.* As for the question MacDonald had asked regarding potential barriers to redevelopment, Peterson responded in relevant part,

> You asked whether there are any regulatory or existing legal agreements that would preclude redevelopment. Yes, there are several unilateral administrative orders that require long term operation and maintenance of the groundwater extraction and treatment system, groundwater monitoring, maintenance of the asphalt cap and protective measures inside the buildings. The cleanup actions taken pursuant to these orders were based on cleanup levels for industrial uses of the property. So if uses other than industrial uses were proposed, it is conceivable that additional cleanup measures may be needed. Those cleanup measures could include removal of pesticide contaminated soil beneath the cap, but we don't see actions such as this to

be a huge obstacle to redevelopment. Presumably, almost any sort of redevelopment would require the demolition of the buildings.

*Id.* Peterson went on to state that the "EPA would certainly be willing to work with parties interested in the redevelopment as long as the environmental concerns are addressed and human health is protected." *Id.* She later confirmed that even if redevelopment were privately funded, the "EPA would need to be involved in the redevelopment process to [e]nsure the environmental concerns discussed above were adequately addressed." *Id.* In closing, Peterson noted the EPA had "received other inquiries about redeveloping the site and would like to convey those to Mr. Taylor at some point." *Id.* at DICO-TRANX000537.

The following day, October 26, 2005, MacDonald sent an email to Peterson thanking her for responding so thoroughly to his questions. Ex. 203. In the email, MacDonald stated, "My plan is to draft a letter to our client using much of the material you have offered so that [sic] get the full and untainted view of the option." *Id.* at DICOTRANX005538. In closing, he further stated, "Obviously, taking such a path will require hard work, commitment, time money and much more...so we shall see if the benefits out weigh the alternative of the status quo." *Id.*

MacDonald testified consistently during his deposition and the 2013 bench trial that he never wrote the letter described in his email to Peterson. On both occasions, he testified he did not do so primarily because he was nervous that suggesting Dico spend money on the site would draw rebuke from Dico management. At trial, MacDonald testified,

> Well, basically, we were relatively new at this site, and part of the intent for this discussion was to get grounding of

what could be and could not be done at the property. And to be honest with you, I hadn't dealt much with the upper management of Dico, and I didn't—I wanted to select an opportunity where I thought such ideas might be welcomed.

And then, ... it was unclear—first of all, the response from the EPA is a little bit complicated, so—these are not easy things to just bring up to somebody, and they also require a fair amount of work and additional cost, which I was very sensitive to because I knew that Dico was unwilling to spend money, even—it seemed even if it might save them in the long run.

MacDonald 2013 Trial Tr. at DICO-TRANS005735. This explanation was consistent with testimony he gave during his deposition:

The bottom line is is what—what you have outlined in—in the EPA's reply is the expenditure of money. No matter what, even if it has a positive end, it has a sequence of events that would be required in which DICO would have to spend some money, and it's not just a little bit of money. It would take a fair amount of money . . . .

And this was my first project working with Cheri [Holley] directly, ... and I was a little bit tentative about going—just being new in the saddle, walking up to Cheri [Holley] and saying, Hey, I've got a great idea; how about spending a lot of money for it and my company will do all the work.

MacDonald 2013 Dep. at DICO-TRANS004931. He continued, "[T]hrough the course of this project, it's absolutely clear that they don't want to spend any money on the site. . . . No doubt about it." Id. at DICOTRANS004931–32.

In any event, by the time MacDonald received Peterson's response to his "trial balloon" email, he had at least tangentially raised the prospect of redevelopment and indirectly expressed support for the idea. See Exs. 202, 203. And in a more general sense, the record clearly indicates MacDonald firmly believed Dico management wanted to avoid any unnecessary expenditures at the Dico site. During his deposition, MacDonald observed,

One thing about the Dico site you must remember is that it's a no-frills project, they don't spend a dime on that site unless they have to, and so if it ain't broke, they don't want you to trade a new wheel in, and that's—so a lot of our stuff was—was carrying forward what had previously been done, because if you remember, it's—it's got a 20–plus year history of things that have been adequate for the EPA . . . .

MacDonald Dep. at DICOTRANS004839–40. Given the advanced age of the groundwater extraction and treatment system, MacDonald advised Dico that sooner or later investing significant additional funds into the site would no longer be optional. When asked if he had talked to anybody from Dico about moving forward to try to close the project out, MacDonald replied,

[W]hen we inherited the groundwater system, it was already 20–years plus old. The—the life cycle of those—those groundwater systems is 20 years; so, you know, I've always told them, you're living on borrowed time with this system, and to replace the system, if you have to replace it, is going to be costly.

Their position's always been to—to minimize the expenditures on the—on the site, and so, by default, guys, you don't have a lot of time before this thing's going to start failing or—and if it does fail, maybe you can patch it back together and you're—but it's going to be expensive, but eventually you're going to have to do something different, something's going to have to happen, because

time won't allow you to—to operate a system beyond its life cycle.

*Id.* at DICOTRANS004912.

In December 2005, five weeks after MacDonald received Peterson's response to his "trial balloon" email, Louis Barrentine joined EME in its Nashville headquarters. In early 2006, MacDonald recruited Barrentine to do consulting work for Dico. At that time, MacDonald gave Barrentine the files EME had on Dico to store in his office, and Barrentine looked through those files and looked at every document they contained.

On April 7, 2006, Peterson participated in a telephone conference with MacDonald and Barrentine regarding the Dico site. The same day MacDonald sent an email to Cheri Holley via her assistant informing her the telephone conference had taken place and summarizing the topics discussed, copying Barrentine. Ex. 328. In the email, MacDonald noted he and Barrentine had expressed to Peterson their desire to "look at all options" and have a "working discussion" concerning what to do with the site. *Id.* He further indicated EME was currently "developing an internal brief" for Holley that would review several different options going forward, "all with an eye toward minimizing remediation measures/costs and short and long term exi[ ]t." *Id.* MacDonald notified Holley that during the telephone conference, Peterson had expressed concern about the broken doors and windows and homeless persons living inside the buildings after driving by the site when she was in Des Moines on other business. Finally, MacDonald told Holley that Peterson had informed them the fire department responded to small fires set in some of the buildings. In conveying this information to Holley, MacDonald warned that security of the site remained an issue that must be addressed to avoid "unwanted issues being raised by the EPA." *Id.*

In closing the email to Holley, MacDonald informed her that he had asked Barrentine to travel to the Dico site the following week. MacDonald also noted that once Barrentine returned, the two would begin preparing the brief that would review options for the site and schedule a meeting in Quincy, Illinois to review them with her. Finally, he requested a copy of the Record of Decision for the site in order to help he and Barrentine fully evaluate the available options, noting that he had already asked Barrentine to see if Mills had a copy and that he could obtain it through the Freedom of Information Act if necessary. During his deposition, MacDonald did not recall how he ultimately obtained a copy of the Record of Decision, but he acknowledged that he eventually "pulled some information off the internet" pertaining to the Dico site. MacDonald Dep. at DICOTRANS004945.

The following week, Barrentine visited the Dico site. Once in Des Moines, Barrentine met with Brian Mills, who granted him access to the site and accompanied him as he toured equipment related to the groundwater extraction and treatment system and completed the annual inspection of the asphalt cap. When Mills and Barrentine arrived on the site, they found the doors to the Production Building and Building 3 were unlocked, and they entered both buildings. Barrentine observed there was graffiti on the walls in Building 3. During that visit, Barrentine obtained copies of several documents pertaining to the Dico site from Mills, including the unilateral administrative orders covering the site and the annual reports submitted to the EPA concerning the building over the past few years.

On April 24, 2006, Barrentine prepared a draft email to Cheri Holley in which he addressed building security and acknowledged obtaining documents from Mills

during his recent visit to the site. *See* Ex. 1006. Barrentine sent the draft to Mac-Donald, who then edited it and sent it back to Barrentine to be sent to Holley via her assistant. In relevant part, the edited draft email stated,

I have been reviewing file information that includes Administrative Orders (AO) that I obtained from Brian Mills during my recent visit for ground water, the DICO buildings and the asphalt cap activities. I have also reviewed the annual reports that cover the past few years as required for each AO. I noticed during my review that DICO is required to conduct sampling within the buildings every two (2) years as stated in the Operation and Maintenance Plan required by the AO. I have not seen a recent report for this sampling in the file information that we have and we have not performed these activities in the past. Although, we can easily include such activities as part of our overall oversight role, if needed.

As Quintin informed you just recently, during a telephone conversation with Mary Peterson, she stated her concerns with the current conditions of the building and specifically commented on the broken windows and vagrants having access to the buildings. She mentioned that she was in Des Moines on other business, but happened to drive by the DICO site. Just today, Quintin received a follow-up e-mail from Mrs. Peterson inquiring about my findings from my site visit ... as well as the building security.... With regards to the buildings, it appears that their condition/security has caught her attention and we would like to know what DICO is required to do per the AO before responding to her. Accordingly, do you know if the AO building sampling requirements have been modified? Are there specific building access restrictions that must be maintained. If so, to which buildings and

what are the requirements. If you have this type of information please send us a copy of the most recent AO or modified Operation and Maintenance Plan for the buildings?

As Quintin has informed you, we are evaluating remedial options and associated costs to identify possible ways to reduce costs and/or to initiate an overall exi[]t strategy from the site, if possible....

*Id.*

MacDonald testified he could not state "with 100 percent certainty" that Barrentine actually sent the draft email to Holley, though he suspected Barrentine did so. MacDonald 2013 Trial Tr. at DICO-TRANS005762. Obviously, the question of whether the email was actually sent does not definitively settle the related question of what EME communicated to Holley with respect to the buildings around that time. But the draft email conclusively demonstrates that both MacDonald and Barrentine had obtained copies of key documents relevant to the Dico site, including the 1994 Order and the original operation and maintenance plan for the buildings approved by the EPA in 1997. It further conclusively demonstrates that by April 2006 MacDonald and Barrentine knew the 1994 Order covered several buildings on the site and imposed requirements on Dico with respect to their care or use. By this point, Barrantine and MacDonald knew that Peterson was concerned about the security and occupation of the buildings and had received her response to the "trial balloon" email broaching the possibility of redevelopment of the site. In light of Peterson's concerns and the content of her email response, they were necessarily aware in their capacities as environmental consultants to Dico (1) that the EPA had once determined the buildings contained environmental contamination of some sort,

(2) that at least some of that contamination remained in the buildings, and (3) that some ongoing limitations with respect to the care or use of the buildings remained in place. EME continued to seek clarification from Holley as to the precise nature of those limitations over the months that followed.

According to MacDonald, EME received some response from Dico with respect to its security concerns for the site. But even so, security continued to be an issue. On July 10, 2006, Mills and Doug Pospisil went to the Dico site to determine why there was no power to the groundwater extraction and treatment system. Once there, they discovered someone had broken into the control room in the Production Building by knocking a large hole (approximately four feet by three feet) through a concrete-block wall and cut the main power lines to the system. The padlock on the control room door remained locked. The same day Mills sent an email to Campbell, MacDonald, Barrentine, and Pospisil with copy to Ken Thompson summarizing what they had observed. Ex. 1137. Mills suggested "increasing security" to prevent future break-ins, noting the occasion marked "the third time in less than a year that the control room for the groundwater extraction and treatment system ha[d] been broken into." *Id.* at D022358. In addition, Mills asked Campbell whether he should be notifying the Des Moines police when break-ins occurred. *Id.* at D022359. MacDonald replied to all parties included on the email that he would "talk to Cheri [Holley] about this." *Id.* at D022358. Thereafter, security at the site purportedly improved somewhat, at least temporarily. However, on one occasion, Mills encountered a homeless person in the Production Building.

In August 2006, MacDonald and Barrentine travelled to Quincy, Illinois, to meet with Cheri Holley regarding the Dico site.

In preparation for the meeting, they prepared a lengthy agenda listing items they intended to discuss with her, and a number of the items appearing on that list concerned the buildings and steps to be taken in evaluating options for the future of the site. Ex. 1007. The following items appeared on the agenda under the heading "Buildings":

—Mary Peterson comments following drive-by

—Evidence of entry

- Grafetti [sic], paint ball, homeless bedding
- Broken Windows
- Cut in fences

—Sampling requirements within buildings

—Report of sampling and building conditions

—Security

*Id.* at D030072. And the following items appeared under the heading "Administrative" and the subheading "Scope of Work":

—Site Planning

- Long Term Goals
- Short Term Goals
- Groundwater Remediation
- Building Maintenance
- Contaminated Soil Remediation

*Id.* The final subsection of the agenda reflected that MacDonald and Barrentine intended to seek guidance from Holley regarding the "Roles and Responsibilities" of both Mills and EME. *Id.* at D030072–73.

The meeting between Holley, MacDonald, and Barrentine, during which Barrentine took extensive notes, took place on or around August 6, 2006. Ex. 1008. During the meeting, the three discussed possible redevelopment alternatives for the property, such as turning the site into a park or erecting new buildings on it.

Throughout this discussion, it was understood that for redevelopment to happen, removal of the old structures would be necessary.

Generally, the discussion with Holley provided some clarity for MacDonald and Barrentine regarding the scope of the contamination of the buildings, but it also raised additional questions the answers to which were not immediately clear. For example, after the meeting, it remained unclear to them when building samples had last been collected and whether sampling was presently required, what the long-term plans were for the buildings, and whether a cost estimate for demolition of the buildings had ever been completed. Thus, although MacDonald and Barrentine attempted to get clarification on whether any inspection or sampling requirements still applied to the buildings, they did not get clear answers on that point. Rather, Holley merely clarified that EME was not tasked with ensuring Dico fulfilled whatever requirements might apply to the buildings.[22] Still, MacDonald and Barrentine learned that Buildings 1 through 5 and the Maintenance Building had been remediated due to pesticide contamination, that the remediation involved taping insulation and encapsulation of the walls and floors using paint, and that "contamination [was] located in the floors, walls and insulation." Id. at D030075. As for the estimated cost of demolition of the buildings, MacDonald recognized that a feasibility study had likely been done and that any such study would likely have included an estimate of demolition costs.

After the August 2006 meeting with Dico, MacDonald and Barrentine continued to discuss redevelopment possibilities for the site as they prepared for an upcoming meeting with Dico, the EPA, and the City of Des Moines. The general focus of that meeting, which was scheduled to take place in September, was to be the redevelopment potential of the Dico site.

On September 22, 2006, representatives of Dico and the EPA gathered at the EPA Region 7 headquarters to discuss potential redevelopment options for the Dico site. Dico was represented by Holley, MacDonald, Barrentine, and two attorneys from Stinson Morrison & Hecker LLP serving as outside counsel to Holley, David Tripp and Stanley Reigel. See Ex. 33. Among the seven individuals representing the EPA were Peterson and her superiors, Glenn Curtis and Cecilia Tapia, Division Director of the Superfund Division of EPA Region 7. Id. The City of Des Moines was represented by Mayor Frank Cownie and other city officials who participated in the meeting remotely.

During the September 2006 redevelopment meeting, it was acknowledged that the Dico site was located on valuable property and that there was tremendous interest its potential redevelopment on the part of the City of Des Moines and potential outside parties interested in purchasing the property or otherwise getting involved. MacDonald also gave a technical presentation directed to the EPA summarizing information regarding the groundwater extraction and treatment system and what he believed to be, in his words, "a fairly compelling argument that really the system was operating only for their pleasure." MacDonald 2013 Trial Tr. at DICO-TRANS005739. But the EPA disagreed, squarely rejecting his proposal to shut

---

22. In contrast, MacDonald and Barrentine left the meeting having received clear direction from Holley to the effect that EME should file the annual report in the capping removal action. Thus, whereas Dico did not file an annual report in the building removal action that summer, Barrentine filed the annual report in the capping removal action with the EPA on August 24, 2006, sending a copy of the report to Holley. Ex. 184.

down the groundwater extraction and treatment system at the Dico site in order to clear one hurdle to its future redevelopment.

On October 16, 2006, Cecilia Tapia sent a letter to Mayor Cownie as a follow-up to the September 2006 redevelopment meeting that took place the prior month. Ex. 198. The letter expressed support for the reuse and revitalization of the Dico site and stated the EPA "would be happy to work with the city, Dico, and any other appropriate parties to assist in making the reuse of this property a reality." *Id.* at DICOTRANX003848. The letter further noted that recent amendments to CERCLA had established limitations on Superfund owner or operator liability for certain categories of persons, including bona fide purchasers, when specified criteria apply. *Id.* These details, among others, concerning the scope of potential liability prospective purchasers might face or the steps that could help them to avoid that liability were provided in the letter and accompanying enclosures. *Id.* at DICO-TRANX003848–49. Copies of the letter were sent to Mills and David Tripp, Holley's outside counsel. *Id.* at DICO-TRANX003849.

Through ongoing communications with the City of Des Moines regarding potential redevelopment of the Dico property, by the spring of 2007, Dico was aware that the EPA was performing a reuse assessment for the property to provide information of interest to potential future redevelopers. The EPA undertook that assessment, which was funded by the EPA's Superfund Redevelopment Initiative, in response to requests for information from the EPA by the City concerning the impact of the remaining contamination at the Dico property on its potential reuse, particularly for nonindustrial purposes. Dico assisted in the performance of the assessment by answering questions and was

generally supportive of the City's desire to spur interest in redevelopment of the property, as the company had no reason not to other than the associated lingering environmental issues.

The reuse assessment culminated in the production of a report by an EPA consultant for potential future developers of the property. The EPA issued that report ("Reuse Planning Report") in March 2007. Ex. 178; *see also* Exs. 35, 199. Beyond providing a comprehensive overview of the history of the remedial actions taken to address various sources of contamination at the site, the Reuse Planning Report addressed potential ways the site might be reused and described the process a developer would need to undertake to redevelop it in light of its being located on an NPL Superfund Site.

With respect to the buildings on the Dico site, the first paragraph of the Reuse Planning Report stated, "Several buildings on the property contain pesticide residues and polychlorinated biphenyls (PCBs)." Ex. 178 at DICOTRANX003394. The report thus indicated a contamination inspection would be a necessary major step to be completed before the existing structures on the Dico site were demolished or deconstructed. *Id.* at DICOTRANX003413. It further stated,

If the property is to be used for industrial purposes, the buildings on the property would require repair and maintenance activities to ensure the protection of workers. This scenario would be a continuation of the operation and maintenance (O & M) plan approved for the current land use....

If the property is to be used for other than industrial purposes and the buildings are to be razed, then additional characterization of the building materials and soils beneath the buildings would be needed.... This information would

be used to determine the most appropriate method of building demolition or deconstruction, whether the building materials could be reused or used as onsite fill, or the appropriate method of disposal. . . .

Following the completion of any characterization work and/or an optimization study, EPA, in consultation with [the Iowa Department of Natural Resources], would prepare a Record of Decision ... Amendment to document any changes to the existing remedial actions.

*Id.* at DICOTRANX003414–15. Furthermore, the report cautioned the final cleanup levels that would be applied to the site in the event of its future redevelopment had yet to be determined by the EPA: "It is important for a developer to understand that the state standards used in this report may not reflect the final cleanup levels; actual cleanup levels will need to be developed in accordance with EPA's risk assessment process, taking into consideration the proposed use of the property." *Id.* at DICOTRANX003396. Additionally, the report conveyed that clearing the path to redevelopment would be time-consuming and costly, as redevelopment could only begin after a series of steps culminating in an amendment to the Record of Decision and negotiation of a consent decree that provided for the implementation of remedial actions selected therein and reimbursement of the EPA for its oversight of associated activities. *Id.* at DICOTRANX003414–15.

On March 19, 2007, Peterson transmitted copies of the report to Dico in advance of it being made public, along with a cover letter noting that the intent of the reuse assessment was to evaluate potential reuse options for the site. Ex. 199. The report and cover letter were sent to Mills, with copies to Cheri Holley and David Tripp. Ex. 34; *see also* Ex. 199 at DICOTRANX003850. The cover letter stated, "EPA believes that the property could be developed for a number of uses, provided appropriate measures are taken to protect human health and the environment over the long term." Ex. 34. Holley reviewed the Reuse Planning Report, and Mills reviewed at least the cover letter sent with his advance copy. Additionally, the Reuse Planning Report was circulated beyond the individuals named on the cover letter to others involved with the Dico property. At a minimum, MacDonald and Barrentine received the report and discussed it, and MacDonald understood that additional characterization of the building materials would be needed in the event they were to be torn down.

By this point, Jim Hughes had learned through Brown some time ago in late 2005 or early 2006 that Dico was interested in selling some additional buildings on the Dico property. Hughes had conveyed that information to a potential buyer, John Rothgeib, a business owner located in Keokuk, Iowa, and proposed that if Rothgeib were to purchase the buildings, SIM could dismantle them, transport the steel beams making up their frames to his location, and reconstruct them on site. Rothgeib thereafter called Brown to express his interest in purchasing some of the Dico buildings. Over the course of a few months, Brown negotiated with Rothgeib by phone on several occasions, conveying information back and forth between him and Campbell. But the negotiations fell through. Prior to receiving the call from Rothgeib, Dico had not publicly solicited a buyer for the buildings, nor Dico had not received any other unsolicited offers to purchase any of the buildings sold to SIM.

Thereafter, Hughes expressed to Brown that he was interested in purchasing additional buildings from Dico for warehouse space. Initially, Hughes offered less than $1 per square foot for the buildings, but that offer was rejected. Hughes and Campbell ultimately reached an agree-

ment, however, and SIM agreed to purchase the Maintenance Building, the western annex of Building 3, Buildings 4 and 5, and the northern end of the Production Building from Titan Tire in three separate transactions for the price of $1 per square foot for a purchase price of $160,200 ("the 2007 transactions"), with $31,320 to be paid in cash and an additional $128,880 to be paid at the rate of $3000 per week in in-kind labor for Titan Tire. Prior to consummating these transactions, Hughes visited the buildings with Brown. In a conversation that took place during one of those visits, Brown mentioned to Hughes that Dico wanted the buildings removed because they presented security problems and because removing them would accommodate future development of the site. Furthermore, Hughes conveyed to Brown that he only intended to reuse the steel frames from the buildings, and the two discussed that Hughes intended to discard the other components or sell them for scrap. In connection with the three transactions, Hughes also met with Campbell on two occasions. On each of those occasions, Brown was also present.

Beginning in May 2007, Titan Tire, on behalf of Dico, executed documents to consummate the transactions with SIM. On May 30, 2007, Campbell signed a bid proposal from SIM to "demo and remove" the Maintenance Building for $12,000.[23] *See* Ex. 2049; *see also* Exs. 278, 282, 1026. On June 25, 2007, Campbell signed a bid proposal from SIM to "demo and remove" the

western annex of Building 3 for $5000. *See* Exs. 1027, 2064; *see also* Exs. 278, 282. On July 26, 2007, Campbell executed a purchase agreement whereby Titan Tire agreed to sell Buildings 4 and 5 and the northern end of the Production Building to SIM for $143,200, with SIM paying 10% down prior to their removal followed by weekly payments of in-kind labor until the remaining balance was paid. Exs. 1028, 2015. On or about that same date, Hughes attended a meeting with Campbell, Brown, Kramer, and Pospisil in Campbell's office. At that meeting, Hughes executed the purchase agreement for Buildings 4 and 5 and the northern end of the Production Building. *See* Exs. 1028, 2015; *see also* Ex. 282.[24]

With the exception of the documents memorializing these transactions, Dico has no written records regarding its decision to authorize Titan Tire to sell buildings on its property to SIM. It is undisputed that Campbell entered into the transactions on behalf of Dico pursuant to a delegation of authority he received from Morry Taylor. It is also undisputed that Campbell did not consult any officer or director of Dico concerning the sale price of the buildings, and no officer or director of Dico was directly involved in negotiating the sale price with SIM.

Between June 19, 2007, and July 31, 2007, SIM executed four checks to Titan Tire totaling $31,320 to cover the first two transactions and the down payment on the third. Exs. 1031–32, 2065–67, 2070. The

---

**23.** The Court acknowledges that the names used to refer to the buildings in this paragraph do not match the names by which they are referenced on the documents cited within it. However, the parties agree as to the identity of the buildings sold in these contracts as well as to their status as buildings covered or not covered by the 1994 Order.

**24.** Campbell and Hughes would later sign an addendum to the purchase agreement for the

sale of the Buildings 4 and 5 and the northern end of the Production Building that added an additional $5554 to the purchase price. The record indicates the addendum reimbursed Titan Tire for costs associated with obtaining a demolition permit from the City of Des Moines on behalf of SIM and costs associated with damage to the asphalt cap caused by SIM during the dismantlement. *See* Exs. 1029, 2068–69, 2072; *see also* Ex. 282 at DICOTRANX007878.

fixed asset disposal form covering the first two transactions was executed on June 28, 2007. Ex. 1153. The fixed asset disposal form covering the third transaction was executed on July 31, 2007. Ex. 1154. Of the total $160,200 purchase price paid by SIM, $117,000 was directly attributable to the contaminated buildings regulated under the 1994 Order. Each of the buildings was sold for precisely its then-present value on the Dico books. As with the Weld Shop sale, all the proceeds from the 2007 transactions were transferred to Dico via intercompany accounting, including the portion SIM paid in in-kind labor. Schuster Dep. at DICOTRANS004225, DICOTRANS004233–35; see Exs. 1014, 1015.

Hughes was warned not to pierce the asphalt cap when the buildings were being dismantled, but no one warned him that the buildings themselves were contaminated. Hughes inquired only as to whether the buildings contained asbestos, and he was told they did not. But once again, given his relationship with Titan Tire, he trusted that if any known contamination existed, someone would have told him about it. Thus, Hughes once again did not conduct any inquiry into the environmental status of the buildings nor consult with an environmental or demolition expert prior to purchasing or dismantling them. Had Hughes known the buildings were contaminated with PCBs, he would not have purchased them. Instead, having never learned of their contaminated status, SIM began dismantling the Maintenance Building, the first of the buildings to be dismantled, on June 19, 2007. SIM continued to dismantle the buildings over the course of 162 days between June and November 2007, proceeding from the Maintenance Building to the western annex of Building 3, Buildings 4 and 5, and finally the northern end of the Production Building.[25]

Prior to the 2007 transactions with SIM, Campbell made no earnest inquiry to determine whether the existence of environmental contamination within the buildings or related restrictions imposed by the EPA might impede the sale of the buildings. Campbell never informed Cheri Holley of his intention to sell the buildings prior to consummating the sales. Campbell, through Brown, eventually informed Mills of his plans to sell the buildings, but only after the terms had been agreed upon. To the extent those conversations involved any environmental inquiry of Mills, that inquiry was narrowly focused to the issue of how the buildings could be dismantled without causing problems with the asphalt cap.

Mills, who communicated with Barrentine by telephone on a semi-regular (i.e., approximately monthly) basis, would later mention during phone calls that the Maintenance Building and, roughly two months later, Buildings 4 and 5 had been sold. As was his usual practice, Barrentine memorialized those conversations in his logbook. Ex. 200 at DICOTRANX003883–84. Among other notes regarding the groundwater treatment and extraction system, Barrentine recorded the following regarding the first of these conversations on May 2, 2007: "Old Maintenance Bldg—Looking to sell bldg and." [26] Id. at DICOTRANX003883. Regarding the second conversation, Barrentine recorded the following on July 11, 2007, in relevant part:

- Maintenance Bldg sold and removed from site.
- Bldgs 4 & 5 sold not removed from site yet.

---

**25.** Buildings 1 and 2 and the remainder of Building 3 presently remain on the Dico property.

**26.** Barrentine wrote nothing on the relevant line of the logbook after the word "and." Ex. 200 at DICOTRANX003883.

*Id.* at DICOTRANX003884. Like the logbook entry on the first conversation, the logbook entry on the second also addressed matters extraneous to the sale concerning the groundwater extraction and treatment system—the sort of matters Mills and Barrentine ordinarily communicated about. Barrentine made no indication in the logbook to suggest that Mills even mentioned the environmental restrictions on the property during those conversations, let alone asked him whether such restrictions might prohibit the buildings from being sold or dismantled.

Prior to the dismantlement of the buildings, neither Mills nor Barrentine reviewed their files or conducted a public records search for documents relevant to the buildings on the Dico site. Nor did they consult with Cheri Holley or Gazi George,[27] the individuals they likely believed were most familiar with the environmental history of the Dico site, upon learning the buildings were to be dismantled. Barrentine never even mentioned the building sales to MacDonald.

In early July, Peterson and Barrentine corresponded concerning the date of the site visit for the fourth five-year review of the remedial actions taken at the Dico site, which had been tentatively scheduled for August 6, 2007. Ex. 39. Peterson informed Barrentine that she would be unable to visit on that date, and together they rescheduled the site visit for September 19, 2007.

On September 5, 2007, Mills sent an email to Barrentine, copying George and Thompson, at 10:54 a.m. Ex. 205. The email stated: "Louis, I wanted you to be aware that there are plans to remove the north end of the production building at Dico (the steel structure). If there are any issues with this please let me know." *Id.*

The record lacks any indication as to what prompted Mills to send the email. At some point after he received this email, George called Mills for clarification, learned about the transactions involving the other buildings, and then called Holley. But just over half an hour after he received it, George sent a lengthy email to Campbell, Mills, and Pospisil regarding the upcoming site visit acknowledging that the buildings were contaminated and that the EPA should have been notified prior to their removal. Ex. 1000. The email stated, in relevant part,

> Louis from EME (Environmental Management Engineering) should have notified Ms. Peterson of the removal of the steel buildings per her request. We should be ready to give her the name and address of the purchaser (only if she asks for it). The reason for that was the presence of PCB & potential non friable asbestos in some building walls.

*Id.* George copied neither Barrentine nor Holley on the email, but minutes later Mills forwarded the email to Barrentine with a message stating that George had requested that he do so. *Id.* Upon receiving the email from George, Mills did not follow up with Brown or take steps to warn SIM employees on the Dico site.

That same or the following day, George called Barrentine and asked him to find the name and address of the individuals who had purchased the buildings. During that call, George told Barrentine that Peterson might ask about the buildings at the upcoming site visit. He also indicated he needed to find out where the buildings were and whether any building parts had been disposed of. On September 6, 2007, Barrentine sent an email to Mills requesting the purchaser information. Ex. 206. On

---

**27.** Following his release from federal prison in February 2007, George had resumed his consulting work for Dico in May 2007.

September 11, 2007, Mills provided the name and address of SIM to Barrentine, noting Hughes as the owner and confirming that SIM had purchased all the buildings to be removed. *Id.* Barrentine passed the requested information along to George sometime thereafter. In an email to Barrentine and MacDonald sent just days later, George noted his main concern with respect to the upcoming site visit was "the notification of removal of buildings." Ex. 1136.

On September 19, 2007, Peterson arrived to conduct the site inspection for the fourth five-year review of the remedial actions taken at the Dico site, during which she was accompanied by Barrentine, Pospisil, and two representatives of the Iowa Department of Natural Resources ("Iowa DNR"), Robert Drustrup and Hylton Jackson. During the site inspection, Peterson learned for the first time that buildings subject to the 1994 Order had been and were being dismantled. By that date, the Maintenance Building had already been completely dismantled and Buildings 4 and 5 had been partially dismantled such that most of the corrugated metal skin that had formerly made up their sides and a portion of their shared roof was missing. Though the dismantlement was incomplete, no SIM employees were on site working that day.

Upon observing the state of the partially dismantled buildings, Peterson made a statement conveying that she should have been notified of any building demolition. Mills did not verbally respond, but Barrentine indicated the topic had been discussed at the meeting he attended with the EPA the fall before. By the time that meeting took place, however, the transactions by which the buildings were sold had not yet materialized. At a later point during the inspection, Barrentine informed Peterson the buildings had been sold. Though Peterson requested information regarding their

new owner and the disposal locations utilized for the building materials that were not to be reused, she was not informed during the inspection that SIM had purchased the buildings. Furthermore, given that there was no dismantlement taking place on the day of the inspection, Peterson concluded there was nothing to be gained by ordering all dismantlement activity to cease immediately and instead elected to consult her colleagues back at the EPA regional headquarters before settling on a response strategy.

The following day, Barrentine responded to an email George had sent asking how the inspection went. Exs. 217, 1009. With the aid of notes he had taken during the inspection, Ex. 216, Barrentine responded to George's inquiry with a brief summary of items discussed during the visit, copying MacDonald and Mills. Ex. 217 at DICO-TRANX004169–70. The first item addressed on the list was how Peterson had responded to the state of the buildings. On that subject, Barrentine wrote,

> Mary showed concerns for not being notified of the building demolition. I indicated to her that it was mentioned during the September 2006 meeting in Kansas City. She asked that I forward information on disposal locations of the building materials and the owner.

*Id.* at DICOTRANX004169. Mills replied to all parties copied on the Barrentine's report that the only thing he had to add was that Peterson "was very pleased that DICO now has a fence around all of the buildings." Ex. 187 at DICO-TRANX003712. George forwarded the email on to Cheri Holley.

Upon returning to the EPA regional headquarters in Kansas City, Missouri, Peterson immediately notified her supervisor and the assigned staff attorney what she had discovered during the site inspection. After much discussion, the team determined the most prudent course of action

was to request information from Dico that would allow the EPA to determine whether Dico had taken adequate precautionary measures to safely dismantle the buildings and dispose of the resulting waste because they lacked adequate information to conclude that human health and safety was imminently at risk.[28] As the team formulated its response, Peterson began documenting her observations and recommendations concerning the site in the site inspection report that would form the basis of the fourth five-year review report. *See* Exs. 30, 40.

On November 8, 2007, Peterson sent a letter to Mills following up on items discussed during the site inspection. Exs. 42, 190. In the letter, Peterson set forth information the EPA sought concerning the building dismantlement, noting the EPA's primary concern was the fate of the PCB-contaminated insulation materials the buildings had contained:

> During the removal action, interior surfaces were cleaned and confirmation sampling indicated that contaminated dust had been removed to acceptable levels for industrial exposures. However, the PCB contaminated insulation was sealed to prevent exposures and was left in place. It is the handling and disposal of the insulation materials that is now a concern to EPA. Therefore, Dico is requested to provide the following information within thirty days of receipt of this letter:
> 1. Results of any sampling of building materials conducted by Dico prior to dismantling of the buildings.
> 2. A description of the handling procedures used with regard to building insulation materials, including a description of steps taken to minimize the release of hazardous substances.
> 3. Copies of all documents relating to the transportation and disposal of all building materials.
> 4. The names of disposal facilities and/or recycling facilities receiving materials resulting from the dismantling of buildings 4 and 5.
> 5. The names of companies who performed the building dismantling.
> 6. The dates over which the building dismantling occurred.

Ex. 42 at DICOTRANX000597. Enclosed with the follow-up letter was a copy of the 1994 Order.

On November 13, 2007, Mills sent Barrentine an email forwarding the EPA letter requesting that he prepare Dico's response to it, copying Pospisil and Thompson. Ex. 181. A few hours later, Barrentine sent an email to Mills asking him to review his files for correspondence with the EPA concerning the buildings. Ex. 2010 at D021396. The following morning, Mills forwarded to Barrentine copies of two documents he found in his files—the letter containing the proposed revised work plan and the EPA letter approving that work plan with handwritten instructions from George to Buttars. Exs. 194, 2010; *see* Ex. 2011. But because Mills sent only documents that mentioned building demolition, he did not forward copies of other relevant documents that were in his files, including the original operation and maintenance plan for the buildings and the acknowledgment letter in which Dico confirmed it would notify the EPA of any change in the status of the buildings. Mills had previously sent Barrentine the 1994 Order attached to a separate email in which he described it as a document Peterson had included along with the follow-up letter. Ex. 211. Mills

---

**28.** For example, the EPA did not know whether Dico had performed sampling and analyses prior to or during the dismantlement, had a health and safety plan in place for workers, or had a protocol in place for selecting appropriate waste disposal locations.

would later claim in an email to George and Thompson that the 1994 Order "was the only document [he had] found in regards to the contamination found in the buildings at Dico." Ex. 1004 at D030084. Yet the original operation and maintenance plan Mills had located in his files described the contamination found in the buildings in considerable detail and expressly acknowledged that the EPA issued the 1994 Order "to address the contaminants present within the buildings." Ex. 8 at DICOTRANX000117.

Barrentine reviewed the documents Mills had sent against the documents EME had in its own files. In addition to the letter containing the proposed revised work plan and the EPA letter approving that work plan, Barrentine found copies of the 1994 Order and the original operation and maintenance plan. On November 14, 2007, Barrentine forwarded George the email Mills had sent with the documents attached. Exs. 194, 2011. In the accompanying message, Barrentine listed the documents he had found in EME's files, indicated he had learned that SIM was the owner of the buildings and the contractor who had dismantled them, and provided the address of the SIM site where the buildings were to be erected. Finally, Barrentine conveyed to George what he had learned about the disposal locations of unused building materials:

Disposal/Recycling Facilities:

Waste Management—Metro East Park Landfill

 Materials: Insulation, skylights, garage doors, misc

Alter Scrap Processing (515–262–0764)

 Metal siding recycled

Ex. 194 at DICOTRANX003741–42.

The same day, Mills sent an email to George in which he claimed to have "com-municated the removal of the buildings to [EME] and [been] told that there [were] no issues with the buildings being removed." Ex. 315 at DICOTRANX008635. Mills copied Thompson, his supervisor at Fehr–Graham, on the email. Several hours later, he forwarded to Thompson his September 5 email about the Production Building. Exs. 180, 283, 312.

Meanwhile, the dismantling of the buildings continued. During the dismantlement process, many little pieces of insulation fell to the ground and were blown about. Brown and Pospisil were onsite during the dismantlement on numerous occasions, including on some occasions at the same time as Hughes. Still, no one warned Hughes that the insulation might be hazardous—not even after Hughes discussed with Brown the fact that the building debris, including the insulation, were being hauled to a landfill.

By November 27, 2007, SIM had finished removing all remaining building materials and debris from the Dico site and transported the steel beams from the dismantled buildings to its property in Ottumwa, Iowa. Meanwhile, the deadline for responding to the EPA follow-up letter regarding the building demolition was fast approaching. In early December, however, Barrentine requested an extension of the deadline on behalf of Dico. Ex. 2050. On December 13, 2007, Peterson granted his request and, in light of the holiday season, extended the deadline just over a month to January 21, 2008. *Id.* The same day, during a telephone call with George, Barrentine learned that Mills had told him that he not only had notified Barrentine the buildings had been sold, but also asked him to notify the EPA.[29] In his logbook for that date, Barrentine wrote,

---

**29.** The Court notes the email Mills sent to George and Thompson on November 14,

2007, did not state that he had instructed

9:10 Gazi George ... shared with me that Brian has indicated that he notified me about bldgs and requested I notify EPA. Gazi wanted me to be aware of this.

Ex. 200 at DICOTRANX003886. On or about the same date, in a separate entry in his logbook made during a phone call with Mills, Barrentine indicated that Mills said he had "been working off of the table in the modified work plan letter." *Id.* at DICOTRANX003887.

On December 17, 2007, Barrentine met with Peterson at the EPA regional office in Kansas City to review the administrative record for the building removal action. During that review, Barrentine obtained copies of a number of documents, among them the 1997 Final Report (Exs. 10, 10R, 179), the 1999 annual report (Exs. 90, 170), and the Eckenfelder Report (Exs. 228, 292). On December 31, 2007, Peterson sent Barrentine a letter acknowledging the visit with copy to Mills. Ex. 212. In the letter, Peterson listed a number of documents, copies of which Barrentine had obtained during the trip, and noted that she understood Barrentine to have been "primarily interested in records containing analytical data resulting from samples collected inside the various buildings." *Id.* at DICOTRANX004157.

On January 14, 2008, Barrentine spoke to Hughes by telephone. The following day, Barrentine documented key aspects of his conversation with Hughes in an email to George sent with copy to MacDonald. Ex. 221. In the email, Barrentine indicated Hughes had told him that most of the insulation from the dismantled buildings had been transported to the Metro Park East Landfill and the interior and exterior metal siding and roofing had been transported to Alder Metal Recycling. *Id.* Bar-

rentine further indicated Hughes had told him that one SIM employee had "transported two (2) semi-truck loads of insulation to his property, he believed in Montezuma, to insulate a building." [30] *Id.* After learning that a SIM employee had kept some insulation from the dismantlement process, George called Hughes and informed him that there had been environmental issues with the insulation in the buildings. Later the same month, Dico replied to the EPA request for information concerning the building dismantlement.

Initially, the EPA was optimistic that the risk of significant PCB exposure related to the movement of the insulation during the building dismantlement had been relatively low. *See* Ex. 29. Available data had revealed the highest PCB concentrations in the insulation nearest to the foil backing, suggesting the PCBs were located in the adhesives used to attach the insulation to the backing. *See* Ex. 17. Additionally, the dismantlement took place over an extended period of time, which might have reduced exposure risks somewhat. *See id.* Hoping to verify its preliminary conclusions, the EPA set out to collect additional information. The EPA thereafter issued requests for information under CERCLA to Dico, SIM, and Waste Management, Inc., the company that had transported the insulation to the Metro Park East Landfill. *See* 42 U.S.C. § 4604(e). After receiving responses to those requests, the EPA issued additional requests for information, and Peterson conducted interviews of Hughes and several SIM employees. The EPA then prepared a sampling plan.

In May 2008, two on-scene coordinators with the EPA, Todd Campbell and Adam Ruiz, went to the SIM site to conduct a

---

Barrentine to inform the EPA of the sale or dismantlement of the buildings.

**30.** George later asked Mills to go to the residence of the employee to collect a sample of this insulation for analysis.

site assessment and conduct sampling. Their findings were documented in a trip report accompanied by a photolog showing locations from which the samples were collected. *See* Ex. 65; *see also* Ex. 117. At the SIM site, Campbell and Ruiz found more than 2000 beams arranged in large piles on the ground in three distinct areas of the property with a combined area of approximately three-quarters of an acre. Insulation and adhesive residue were evident on a significant portion of the beams, and there were larger pieces of foil-backed insulation in and around the piles. Campbell and Ruiz collected wipe samples from multiple beams, samples of soil located in the vicinity of the piles, and a single grab sample from a piece of foil-backed yellow fiberglass insulation. Ex. 65 at DICOSIM–025088; *see also* Ex. 79.

That same month, the samples collected at the SIM site were analyzed for the presence of PCBs to determine whether PCB residue remained on the steel beams themselves and whether PCBs had migrated from the beams onto the surrounding soils. Ex. 56. That analysis revealed the presence of PCBs on some of the beams, in the soil, and in the insulation sample. *See id.; see also* Ex. 79. Of the eleven beams that were wipe sampled, seven had PCB concentrations in excess of 10 $\mu$g/100 cm$^2$, five of which had PCB concentrations in excess of 150 $\mu$g/100 cm$^2$. Ex. 56 at DICOTRANX000652; *see also* Ex. 79 at DICOTRANX001236. The PCB concentration in the bulk insulation sample was 6300 parts per million. Ex. 56 at DICOTRANX000655; *see also* Ex. 79 at DICOTRANS001236. The EPA thereafter determined the presence of the contaminated beams on the SIM site presented "a

threat of direct contact exposures to SIM workers, site visitors, and trespassers." Ex. 79 at DICOTRANX001236. The EPA further concluded that "[a]ctual or threatened release of hazardous substances from the SIM site, if not addressed ..., may present an imminent and substantial endangerment to public health, welfare, or the environment." *Id.* at DICO-TRANX001238. Negotiations to reach an administrative settlement regarding the cleanup of the SIM site ensued but were ultimately unsuccessful.

On December 30, 2008, the EPA issued a unilateral administrative order requiring Dico and Titan Tire to work with an environmental contractor to perform a removal action at the SIM site. Ex. 80. The 2008 Order became effective on January 23, 2009.

Dico and Titan Tire utilized a removal action contractor, Greenleaf, Inc., ("Greenleaf") to perform the work at the SIM site required by the 2008 Order.[31] More than four tons of different types of insulation were removed from the SIM site, the testing of which revealed the presence of PCBs. *Dico*, 808 F.3d at 346. Decontamination of the beams began in June 2009, more than eighteen months after SIM had transported the last of the beams purchased in the 2007 transactions to Ottumwa. Out of 2281 beams transported to the SIM site, only 798 (approximately 35%) had no residual insulation or adhesive apparent upon visual inspection. Ex. 2058 at D010295. Of those 798 beams lacking any visible residual insulation or adhesive, 81 (just over 10%) were selected for wipe sampling, revealing surficial PCB concentrations exceeding 10 $\mu$g/100 cm$^2$ on 18

---

**31.** In addition to the remedial activities Dico undertook at the SIM site pursuant to the 2008 Order, in the spring of 2008, Dico contracted with Greenleaf to perform remedial activities at properties owned by two SIM employees. *See* Ex. 156. These remedial activi-

ties, which involved the removal of insulation that had originated in the Dico buildings and associated sampling, were documented by Greenleaf in a separate report released on April 18, 2008. *See id.*

beams (approximately 22%). *See id.* These 18 beams plus an additional 54 beams identified through visual reinspection were ultimately decontaminated in addition to the 1483 beams initially identified as having visible residual insulation and adhesive. *See id.* at D010295–96. In all, out of the 2281 beams transported to the SIM site, 1555 beams (approximately 68%) were determined to require decontamination. *Id.* at D010296, D010301. Defendants paid $537,266.96 for the sampling and decontamination effort.

On May 7, 2010, Greenleaf submitted a final report to the EPA describing the steps it took to comply with the 2008 Order ("2010 Final Report"). *See id.; see also* Exs. 1134, 1135, 1138. On June 1, 2010, the EPA issued a notice of completion concerning the work required by the 2008 Order to Dico and Titan Tire. Ex. 67. The Government sent Defendants a written demand for response costs it incurred in connection with the SIM site on or around September 27, 2010.

The Court will find additional facts as necessary to support its conclusions of law in the remaining sections of this opinion.

### III. LAW OF THE CASE & ALTERNATE FINDINGS OF FACT

 The law of the case doctrine provides that when a district court conducts proceedings on remand, "every question decided by the appellate court, whether expressly or by necessary implication, is finally settled and determined, and the court on remand is bound by the decree and must carry it into execution ...." *Thompson v. C.I.R.*, 821 F.3d 1008, 1011 (8th Cir. 2016). Moreover, past rulings by the district court that "either have not been appealed or have been appealed and affirmed ... need not be revisited." *Liddell by Liddell v. Bd. of Educ. of St. Louis*, 121 F.3d 1201, 1216 (8th Cir. 1997).

Given the unique procedural posture of this case—in particular, given that this Court's summary judgment rulings on liability and its order imposing civil penalties and punitive damages following the 2013 bench trial were affirmed in part and reversed in part by the Court of Appeals—this Court has devoted significant attention to the question of what constitutes the law of the case in its pretrial rulings on remand. *See* Clerk's Nos. 298 at 22–39; *see also* Clerk's No. 326 at 3–9. In a ruling addressing motions filed by the parties on remand, the Court ruled that because the Court of Appeals determined the cleanup costs the Government incurred at the SIM site resulted from the sale of the beams to SIM, the law of the case on remand encompassed its implicit determination that at least a portion of the PCBs discovered at the SIM site originated in the buildings sold to SIM. Clerk's No. 298 at 34–35; *see Dico*, 808 F.3d at 354. Accordingly, the Court barred the parties from presenting at trial any argument, evidence, opinion, and testimony as to the origin of the PCBs discovered at the SIM site in the trial on remand. Clerk's No. 128 at 37. Defendants have expressed their intention to appeal this ruling if they do not prevail on the remaining issues following bench trial on remand.

The factual issue of whether any of the PCBs discovered on the SIM site originated in the contaminated buildings Defendants sold to SIM concerns a potential defense to arranger liability. When the requisite intent for arranger liability exists, liability ordinarily extends to "all costs of removal or remedial action incurred by the United States Government ... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a). However, a defendant may defeat liability for response costs incurred by the Government by establishing those costs resulted from a release or threat of release of a

hazardous substance caused solely by an act or omission of a third party. *Id.* § 9607(b), (b)(3). Thus here, even assuming Defendants intended to dispose of a hazardous substance when they sold the contaminated buildings to SIM within the meaning of 42 U.S.C. § 9607(a), if none of the PCBs discovered at the SIM site originated in the contaminated buildings, Defendants are not liable for any response costs the Government incurred at the SIM site. *See* 42 U.S.C. § 9607(b). On the other hand, if Defendants sold the contaminated buildings with the requisite intent and at least some of the PCBs discovered at the SIM site originated within them, they are jointly and severally liable for all response costs the Government incurred in connection with the SIM site unless they establish with concrete and specific evidence that the harms that caused the Government to incur those costs are divisible such that a reasonable basis for apportionment exists. *See United States v. Hercules, Inc.,* 247 F.3d 706, 716–18 (8th Cir. 2001); *see also Burlington N. & Santa Fe Ry. Co. v. United States,* 556 U.S. 599, 614, 129 S.Ct. 1870, 173 L.Ed.2d 812 (2009).

The Court permitted the parties to make offers of proof concerning the origin of the PCBs discovered at the SIM site at trial. The Government requests that this Court consider the parties' submissions and make alternative findings of fact concerning this issue in its ruling on the merits. The Court concludes that alternative findings of fact as to the origin of the PCBs discovered at the SIM site will benefit the parties and promote judicial economy in the event its ruling that the law of the case doctrine applies to this issue is reversed on appeal. Accordingly, having considered all the evidence submitted by the parties concerning the question of the origin of the PCBs discovered at the SIM site, the Court finds the following facts.

There are 209 chemical compounds classified as PCBs. These compounds are known as PCB cogeners, and they vary as to their characteristics across a broad array of chemical properties. From the 1930s through the 1970s, Monsanto manufactured and sold PCBs in the United States under the trade name Aroclor. Monsanto produced several different Aroclors, each containing a different subset of PCB cogeners selected to achieve different purposes. For example, some Aroclors are liquids and others are solids. By analyzing PCB-containing materials for characteristic PCB cogeners in concentrations associated with specific Aroclors, it is possible to identify when a particular Aroclor is present. Additionally, in-depth cogener-specific analysis can be utilized to identify Aroclors in degraded or mixed-Aroclor samples.

Analytical testing was conducted on samples taken at various times from the Dico site, the SIM site, and insulation taken from the Dico site to the homes of SIM employees to determine the presence of particular Aroclors. Every Aroclor identified on the SIM site was also identified in an insulation sample taken from the Dico site. The following findings support this conclusion.

- Aroclor 1260 was not detected at the SIM site. Aroclor 1260 was identified at the Dico site, but only in Building 2 and the northern part of Building 3, neither of which was sold to SIM. Ex. 292 at DICOTRANX008306. There is no reason to expect that Aroclor 1260 would have migrated from the Dico site to the SIM site, as the only identified sources of Aroclor 1260 at the Dico site were buildings or portions of buildings Defendants did not sell to SIM.

- Aroclor 1254 was identified in insulation that was taken to the home of a SIM employee from Buildings 4 and

5 on the Dico site. Ex. 156 at TE0156–0003, TE0156–0021; *see* 2017 Trial Tr. Vol. I at 191. Aroclor 1254 was also identified in soil samples and in wipe samples of the beams collected at the SIM site. Ex. 1134 at DICOSIM–004370; Ex. 56 at DICOTRANX000652–53. Aroclor 1254 was identified at the DICO site in Buildings 2, 3, 4, and 5. Ex. 292 at DICOTRANX008306–09.

- Aroclor 1248 was found in insulation that was taken to the home of a SIM employee from Buildings 4 and 5 on the Dico site. Ex. 156 at TE0156–0003, TE0156–0026; *see* 2017 Trial Tr. Vol. I at 191. Aroclor 1248 was also identified in soil samples and in wipe samples of the beams collected at the SIM site. Ex. 1134 at DICO-SIM–4433–40; Ex. 56 at DICO-

TRANX000652–53; 2017 Trial Tr. Vol. II at 502–03.[32]

No potential alternative sources for the PCBs discovered at the SIM site have been identified through analytical testing of items or locations associated therewith.[33] Nor is there any reason to conclude the PCBs discovered at the SIM site originated in the unregulated Production Building, which has never been tested for PCBs.[34]

Having considered the evidence submitted by the parties as offers of proof concerning the origin of the PCBs discovered at the SIM site alongside all other evidence submitted at trial relevant to this question, the Court finds that at least some of the PCBs discovered at the SIM site originated in the Dico buildings subject to the 1994 Order. Moreover, the Court concludes Defendants have failed to prove by a preponderance of the evidence that any of the PCBs discovered at the

**32.** The Court disregards the testimony of defense expert Dr. Remy Hennet that the "geochemical fingerprints" of the PCBs found at the Dico site and those found at the SIM site did not match. *See* 2017 Trial Tr. Vol. II at 446, 449–50, 465–67, 497–505. During cross-examination, Hennet admitted he was mistaken concerning the data upon which he based that opinion. Because the opinion was based on unreliable methods utilizing insufficient facts or data, it is inadmissible under Federal Rule of Evidence 702.

**33.** Defendants produced no evidence indicating that items located on the SIM site, such as transformers or pipe insulation, have been confirmed to have had prior contact with PCBs. Furthermore, the Court notes the testimony of Jim Hughes that other items on the SIM site had not come into contact with PCBs constituted permissible lay opinion testimony. In particular, the Court notes Hughes's testimony was rationally based on his personal knowledge concerning the origins of and his personal observations concerning the physical condition of various items on the SIM site. *See* Fed. R. Evid. 701. In contrast, the Court concludes the testimony by defense expert Dr. Remy Hennet that other sources of PCBs were present on the

SIM site constituted impermissible expert opinion. *See* Fed. R. Evid. 702. The Court notes that testimony was based on sheer speculation rather than sufficient facts or data and was not the product of reliable principles and methods. *See* 2017 Trial Tr. Vol. II at 468–70, 505–06. Additionally, Court notes that testimony was not supported by personal knowledge or observation, as Hennet neither conducted any testing on other items at the SIM site nor observed any labels on other items at the SIM site indicating the presence of PCBs.

**34.** The Court notes the results of the analytical testing conducted during the SIM site removal action is consistent with this conclusion. Approximately 68% of the 2281 beams transported from the Dico site to the SIM site had visible residual insulation or adhesive still attached by the time the SIM site removal action began more than eighteen months later. *See* Ex. 2058 at D010295. With respect to those beams that did not have visible residue, random sampling suggested an estimated 10% were also contaminated with PCBs. *Id.* Meanwhile, Defendants estimate that approximately 27% of the steel beams transported to the SIM site following the 2007 transactions came from the unregulated Production Building.

SIM site originated from any source other than the regulated buildings. Thus, even assuming some of the PCBs discovered at the SIM site originated from other sources, i.e., items stored at the SIM site prior to the building sale or the unregulated Production Building, Defendants established no reasonably certain basis for apportionment of the costs the Government incurred in connection with the PCBs discovered at the SIM site.

## IV. CONCLUSIONS OF LAW

### A. *Arranger Liability*

#### 1. *Scope of inquiry on remand.*

The Court begins its analysis by addressing the appropriate scope of its inquiry on remand as to the question of whether Defendants are liable as arrangers within the meaning of 42 U.S.C. § 9607(a), a point on which the parties disagree. Defendants contend the Court necessarily must examine every subsidiary issue relevant to arranger liability anew, and the Government contends the Court may do so only insofar as genuine disputes as to material facts precluded summary judgment. The Court concludes that neither party is correct.

On appeal from the order of this Court holding Defendants liable as arrangers under § 9603(a) as a matter of law, the Court of Appeals determined the issue of intent, the central question to determining whether arranger liability exists, should not have been decided at summary judgment. *Dico*, 808 F.3d at 349, 351. In particular, the Court of Appeals concluded genuine disputes precluding summary judgment existed as to two factors relevant to discerning intent in the context of this case: the usefulness of the buildings and the building components and the disposal or remediation costs Defendants avoided by selling them. *Id.* at 349–51 & n.4. However, the Court of Appeals also acknowledged that other facts may be suggestive as to wheth-

er the requisite intent for arranger liability exists. *See id.* at 348, 350.

The Court of Appeals did not affirm any ruling of this Court on the question of whether Defendants had the requisite intent for arranger liability; rather, it reversed and vacated in its entirety the order in which the Court so concluded. The Court therefore declines to interpret the appellate opinion as limiting its consideration on remand with respect to the question of whether Defendants intended to arrange for the disposal of a hazardous substance when it sold the buildings covered by the 1994 Order to SIM.

#### 2. *Analysis of factors suggestive of intent.*

CERCLA imposes strict liability for environmental contamination on

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a)(3). The Government alleges Defendants arranged for the disposal of a hazardous substance within the meaning of CERCLA by entering into the transactions that led to the dismantling of Dico buildings subject to the 1994 Order.

■■■ "Arranger liability ensures that owners of hazardous substances may not free themselves from liability by selling or otherwise transferring a hazardous substance to another party for the purpose of disposal." *Dico*, 808 F.3d at 346 (quoting *Team Enters., LLC v. W. Inv. Real Estate Trust*, 647 F.3d 901, 907 (9th Cir. 2011)). Absent a statutory defense, arranger liability ordinarily exists when a seller engages in "a transaction for the sole pur-

pose of discarding a used and no longer useful hazardous substance." *Id.* at 346 (quoting *Burlington,* 556 U.S. at 610, 129 S.Ct. 1870). In contrast, arranger liability does not exist when the sale of "a new and useful product" to a purchaser results in the later disposal of the product in a manner that causes contamination "unbeknownst to the seller." *Id.* (quoting *Burlington,* 556 U.S. at 610, 129 S.Ct. 1870). In cases falling between these two extremes, however, determining whether arranger liability exists involves "a fact-intensive inquiry that looks beyond the parties' characterization of the transaction ... and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions." *Id.* (quoting *Burlington,* 556 U.S. at 610, 129 S.Ct. 1870). Particularly relevant to this inquiry is the fact the word " 'arrange' implies action directed to a specific purpose." *Id.* at 346 (quoting *Burlington,* 556 U.S. at 611, 129 S.Ct. 1870). As such, "the central question" in determining whether arranger liability exists in such cases "is the intent of the seller in the particular transaction." *Id.* at 349.

With these general principles in mind, to determine whether Defendants are liable under 42 U.S.C. § 9607(a)(3), the Court will now consider factors relevant to the question of whether Defendants intended to dispose of the contaminated insulation the buildings contained when they sold the regulated buildings to SIM.

■ a. *Knowledge.* Knowledge that the eventual disposal of a hazardous substance would result from the sale of a contaminated product is insufficient standing alone to establish a seller intentionally arranged for the disposal of a hazardous substance. *Id.* at 348. Nevertheless, a seller's knowledge that a hazardous substance would be "leaked, spilled, dumped, or otherwise discarded may provide evidence of ... intent to dispose of its hazardous

wastes." *See id.* at 347 (quoting *Burlington,* 556 U.S. at 612, 129 S.Ct. 1870). Such knowledge plainly exists when a seller sells a product knowing the product contains a hazardous substance when its sale will result in its complete dismantlement, thereby necessarily causing the release of that substance. Likewise, such knowledge plainly exists when a seller sells a product knowing it is sealed within a container that must be opened in order to obtain it along with a hazardous substance, as use of the product under such circumstances would necessarily be preceded by release of the hazardous substance.

■ Following a careful examination of all the testimony and documentary evidence produced by the parties, as recounted in its preceding findings of fact, the Court finds:

- The following individuals were officers or key employees of Dico, knew the buildings were contaminated, and understood the buildings were subject to ongoing EPA requirements before the buildings were sold: Morry Taylor, Cheri Holley, Don Brown, Dan Buttars, and Jeff Kramer.

- The following individuals were officers or key employees of Titan Tire who performed significant environmental work on behalf of Dico in the course of their employment with Titan Tire prior to the sale of the buildings, knew the buildings were contaminated, and understood the buildings were subject to ongoing EPA requirements before the buildings were sold: Cheri Holley, Bill Campbell, Brian Mersch, Gary Schuster, and Gary Carlson.

- The following environmental consultants, each of whom performed significant environmental work on behalf of Dico, knew the buildings were contaminated, and understood the buildings were subject to ongoing

EPA requirements before the buildings were sold: Dr. Gazi George, Quintin MacDonald, Louis Barrentine, and Brian Mills, who also served as the environmental coordinator for both Dico and Titan Tire.

- The following individuals performed significant environmental work on behalf of Dico in the course of their employment with affiliated corporate entities other than Titan Tire, knew the buildings were contaminated, and understood the buildings were subject to ongoing EPA requirements before the buildings were sold: Jim Fechter and Thomas Duncan.

The knowledge of the officers and key employees of Dico and Titan Tire that the buildings were contaminated and subject to ongoing EPA requirements was conclusive upon both corporations at the time the buildings were sold to SIM. Generally, "the knowledge of the employees is the knowledge of the corporation." *Apex Oil Co. v. United States*, 530 F.2d 1291, 1295 (8th Cir. 1976). As the Eighth Circuit has observed,

> It is a well settled principle that knowledge of officers and key employees of a corporation, obtained while acting in the course of their employment and within the scope of their authority, is imputed to the corporation itself. Furthermore, knowledge by a corporation, obtained by and through its officers and key employees, of facts of continuing importance to the business of the corporation, even after the termination of services of that officer or employee, is conclusive upon the corporation.

*Acme Precision Prods., Inc. v. Am. Alloys Corp.*, 422 F.2d 1395, 1398 (8th Cir. 1970) (citations omitted). Obviously, the fact that the buildings were contaminated and subject to ongoing EPA requirements constituted a fact of continuing importance to the business of Dico. Thus, knowledge of the contamination and the ongoing EPA requirements that the above officers and key employees of Dico gained in the course of their employment is conclusive upon Dico even after the termination of their services. *See id.*

The Court further finds there can be no question that Dico and Titan Tire knew the buildings would be dismantled once they were sold.[35] Dico and Titan Tire sold

---

**35.** In reaching this conclusion, the Court rejects as inadmissible and unpersuasive the testimony of defense expert Dr. Remy Hennet as to his opinion that, based on the data available at the time, "it would have been reasonable" for Dico and Titan Tire personnel to "conclude at the time ... when the buildings were sold ... that there would be no concern regarding ... PCBs in the materials ... that were being sold in the sense that the materials ... would not have PCBs in excess of the regulatory standards so they could be ... handled, reused, or disposed of within the regulations." 2017 Trial Tr. Vol. II at 459–60. Federal Rule of Evidence 702 requires that expert testimony must utilize the expert's specialized knowledge to help the trier of fact understand the evidence or determine a fact in issue, be based on sufficient facts or data, and be the product of reliable methods. Hennet's opinion as to what Defendants reasonably could have believed met none of these requirements. The opinion was not helpful to the Court because it was neither based on specialized knowledge nor relevant to any fact in issue. Hennet admitted that in forming his opinion, he reviewed information that was available to Defendants not as a scientist but "as a layperson." 2017 Trial Tr. Vol. II at 490. Additionally, the opinion was unhelpful because it concerned the question of whether Defendants could have reasonably believed the building materials were subject to costly disposal requirements under the Toxic Substances Control Act, 15 U.S.C. §§ 2601 *et seq.*, which is irrelevant to the question of whether Defendants intended to dispose of hazardous substances in violation of CERCLA. Finally, the opinion was neither the product of reliable methods nor based on sufficient facts or data. Hennet formed his opinion as to what Defendants reasonably could have believed by

the buildings with the intention they would be dismantled and removed from the real property on which they were located. Whether Dico and Titan Tire conceived of the underlying transactions as sales of complete buildings or sales of structural steel beams is therefore immaterial in determining whether they acted with the intent to arrange for the disposal of the hazardous substances they contained.

Defendants knew the buildings were contaminated and subject to ongoing EPA requirements and knew the buildings would be dismantled when they were sold to SIM. The Court therefore concludes Defendants' knowledge that a hazardous substance would be released when the contaminated buildings were sold is evidence that they intended to dispose of hazardous wastes. *See Dico*, 808 F.3d at 348.

■■■■ b. *Usefulness & commercial value.* The usefulness of a product does not necessarily reflect the character of the transaction by which it was purchased or the intent of the seller who sold it. *Dico*, 808 F.3d at 349. Still, "the usefulness of a product—however defined—is an important but not dispositive factor to consider in determining" whether the seller of the product intended to arrange for the disposal of a hazardous substance. *Id.* In considering whether the usefulness of the product sold is suggestive of intent, the mere fact that some portion of product could not be reused does not necessarily render it entirely useless. *See id.* at 351.

Judged from the perspective of Defendants, the buildings subject to the 1994 Order were not particularly useful in their present condition prior to the 2007 transactions. On the contrary, the very fact that

the buildings were still standing cost Defendants money to pay for security measures and to perform repairs necessary to keep out homeless persons and vandals. Though the buildings were not being used, Defendants regarded repairs and security measures such as onsite security and fencing as costs they had to incur in order to prevent damage to the groundwater extraction and treatment system, ensure the safety of onsite workers, prevent theft, and avoid unwanted scrutiny from the EPA regarding either shutdowns of the groundwater extraction and treatment system or the occupation of the buildings in their unmaintained state. For these reasons, prior to the 2007 transactions, the buildings subject to the 1994 Order not only lacked commercial usefulness in their state of disrepair—a state in which they were not legally fit for their intended purposes as manufacturing or warehousing facilities—but also represented ongoing liabilities to Defendants.

Notwithstanding the limited usefulness of the buildings as standing structures in their present condition, the structural steel beams in Butler-style buildings ordinarily are reusable. Thus, there is a resale market for used Butler-style buildings, as their steel frames can be dismantled, transported, and reassembled in a new location. But that market reflects that the only valuable component of used Butler-style buildings is the structural steel beams they contain because their remaining components—insulation, pipes, wiring, and exterior metal sheeting—cannot ordinarily be reused and must be discarded.

The usefulness and commercial value of the structural steel beams contained in the

reviewing documents provided by defense counsel from the perspective of a layperson. This methodology, which at bottom involves making assumptions about what others would think, does not constitute a reliable method. In addition, Hennet based his conclusions on

insufficient data, as he was not provided with sources arguably indicating what various individuals subjectively believed prior to the sale of the buildings and disregarded without adequate cause the data contained in the Eckenfelder Report.

buildings subject to the 1994 Order is difficult to unpack. All the beams sold to SIM had the physical capacity to serve their intended purpose as component parts of a structural frame capable of supporting walls and a roof. Thus, even though Defendants never advertised the buildings for sale, Rothgeib and Hughes approached them with interest in purchasing them, and Defendants ultimately sold them for substantial value—$1 per square foot.

Although all the buildings had substantial commercial value in theory, however, the value of the contaminated beams was in practice substantially limited by their inability to be reused without appropriate sampling and decontamination. The steel beams from the contaminated buildings could not safely be reused without testing, as they were nestled among the contaminated insulation and adhesive prior to the dismantlement of the buildings. Thus, insulation and adhesive remained visible on 65% of the beams even after the buildings had been dismantled and the beams had been left outside in the elements on the SIM site for well over eighteen months. According to the 2010 Final Report prepared by the removal action contractor hired by Defendants, by June 2010, PCBs remained detectable on approximately 22% of the beams that *lacked* visible insulation and adhesive in significant concentrations exceeding 10 $\mu$g/100 cm$^2$. Of the beams transported to the SIM site following the 2007 transactions, including those that came from the unregulated Production Building, Defendants' removal action contractor decontaminated 1555 out of the 2281 beams (approximately 68%) following

visual inspection and random sampling. Furthermore, the remedial sampling and decontamination cost Defendants $537,266.96.

On the one hand, the commercial value of the beams sold to SIM was undoubtedly affected by the fact they could not safely or legally be reused absent appropriate sampling or decontamination. In fact, Hughes testified he "would not even have looked at" the buildings if he had known they were contaminated with PCBs. 2017 Trial Tr. Vol. I at 187. On the other hand, though the commercial value of the beams was diminished by the fact that they were contaminated, it is possible Defendants could have found a willing buyer for the contaminated buildings. Although the testing and decontamination costs Defendants paid substantially exceeded the price SIM paid for the buildings, those costs were marginally inflated by the fact that roughly 27% of the beams transported to the SIM site came from the unregulated Production Building[36] and would not have required testing or decontamination at all were it not for their having been stored among the contaminated beams.[37] Furthermore, though the record indicates comparable new building components could have been purchased out of a catalog or from a store, it contains no evidence as to what comparable components might have cost. Finally, the price SIM was willing to pay for the buildings was likely influenced to some degree by other factors idiosyncratic to SIM. For example, it is undisputed that SIM intended to pay its employees to dismantle the buildings, transport them to

**36.** Defendants calculated this figure by taking the square footage of the northern end of the Production Building (43,200) and dividing it by the total square footage of the buildings sold to SIM in 2007 (160,200).

**37.** Defendants claim fewer beams would have had to be cleaned or scarified if the insulation

had been "completely removed" from them when the buildings were dismantled. However, Defendants have little more than supposition to back up this claim. The record contains no evidence suggesting the insulation and adhesive residue remaining on the beams could have been "completely removed" without cleaning or scarifying them.

Ottumwa, and reconstruct them.[38] It is possible a buyer who anticipated fewer overhead costs for dismantlement, transportation, or reconstruction would have been willing to pay more for the contaminated beams than SIM was.[39]

In light of the foregoing, the Court concludes the steel beams in the contaminated buildings retained their usefulness for their intended purpose, provided they were appropriately sampled and decontaminated. The Court further finds that although the commercial value of the beams was significantly diminished by the fact that they were contaminated with PCBs, they might have retained some commercial value. On balance, the Court concludes these facts standing alone, though not dispositive of what Defendants intended, weigh slightly in favor of concluding Defendants did not intend to arrange for the disposal of hazardous substance by selling the contaminated buildings to SIM.

■ c. *Value received & costs avoided.* Another "valid and important consideration in discerning a seller's intent in a particular transaction" is "the balance of the value received by the seller compared to the cost avoided of having to address the proper disposal or remediation cost" associated therewith. *Dico,* 808 F.3d at 350. As the Court of Appeals observed,

> A party may sell a still "useful" product, i.e., fit either for its intended purpose or some other purpose useful to the buyer, with the full intention to rid itself of

environmental liability rather than a legitimate sale, for example where the cost of disposal or contamination remediation would greatly exceed its purchase price (e.g., selling a working and useful piece of machinery for $10,000 that comes along with a $100,000 price tag for remediation costs).

*Id.* at 349.

The parties stipulated that of the $160,200 total purchase price paid by SIM pursuant to the 2007 transactions, $117,000 was directly attributable to the contaminated buildings regulated under the 1994 Order. Clerk's No. 317 at 7 ("$117,000 of the total purchase price was directly attributable to the Maintenance Building, the western annex of Building 3, and Buildings 4 and 5."). The portion of the value Titan Tire received from SIM and transferred to Dico via intercompany accounting attributable to the contaminated buildings regulated under the 1994 Order was also $117,000. The Court therefore concludes that $117,000 represents the total value Defendants received attributable to the sales of the contaminated buildings.

In arriving at this conclusion, the Court rejects Defendants' argument that SIM's labor costs for the building dismantlement, which Defendants estimate to have been approximately $500,000 for all the buildings,[40] is part of the value they received from SIM. Daniel Hoffman, Defendants' expert on the demolition industry, testified at trial that "everybody understands" buy-

38. In addition to the SIM labor records already admitted at trial in Exhibits 1037 and 1041, the Court admits Exhibit 1042, a SIM timekeeping record Defendants submitted as an offer of proof.

39. The record contains no evidence suggesting how much the costs associated with dismantlement, transport, and reassembly might have varied between purchasers. But it is undisputed that SIM was not an experienced demolition contractor, and an experienced

demolition contractor might have been able to dismantle the buildings more efficiently than SIM did. Similarly, a purchaser who intended to relocate the buildings to a nearer location might have paid less to transport them than SIM paid.

40. This argument fails in part on the ground that even if Defendants had viewed the labor SIM performed as part of the value they received, only a portion of that labor was associated with the contaminated buildings.

ers of Butler-style buildings (or their demolition contractors) take them down themselves. 2017 Trial Tr. Vol. III at 559, 562–63, 565–65. Furthermore, the evidence produced at trial does not indicate Defendants viewed the labor SIM performed during the building dismantlement as part of the value they received. Notably, Defendants did not account for *this* labor in their books, even though they did account for the in-kind labor SIM performed in satisfaction of the purchase price.

Turning to the costs avoided by removing the buildings from the Dico site, based on the 1996 Feasibility Study prepared by Black & Veatch and the costs Defendants paid to remediate the beams transported to the SIM site, the Government estimates Dico avoided more than $1.6 million in remediation and disposal costs by selling the regulated buildings to SIM. However, Defendants object to reliance on the Feasibility Study as a basis for estimating relevant avoided costs because it assumed the PCB-contaminated insulation removed from the regulated buildings would need to be disposed of as hazardous waste. In particular, Defendants contend the Feasibility Study incorrectly assumed that insulation removed from the buildings would have PCB concentrations exceeding 50 parts per million and that insulation having such PCB concentrations must be disposed of as hazardous waste in a permitted landfill under the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq. ("TSCA"). Defendants also allege the EPA indicated the insulation need not be disposed of as hazardous waste in the March 2007 Reuse Planning Report, which stated that if the buildings were to be demolished, the Iowa DNR might permit the disposal of building materials as special waste in the Des Moines landfill depending on contaminant concentration levels. Defendants thus argue the best information available to them when they sold the contaminated buildings to SIM indicated the disposal costs associated with the contaminated insulation would be far lower than the Feasibility Study anticipated.[41]

The Court rejects Defendants' argument in its entirety. After close examination of the Eckenfelder data, the May 2008 sam-

---

41. In support of this position, Defendants produced testimony by Mel Pins, an executive officer with the Iowa DNR, who testified the Iowa DNR construes the TSCA to permit the disposal of PCB-contaminated insulation as PCB bulk product waste rather than requiring its disposal as PCB remediation waste. *See* 40 C.F.R. §§ 761.3, 761.61, 761.62. The Government's objections to the admission of this testimony on relevance and other grounds are hereby overruled.

Next, Defendants produced a July 2008 letter from Iowa DNR expressing its disagreement with the EPA's determination that the insulation from the Dico site constitutes PCB remediation waste rather than PCB bulk product waste. Ex. 24. However, the Court notes that Defendants produced no evidence suggesting they knew that the Iowa DNR disagreed with the EPA's determination as to the proper categorization of PCB-contaminated insulation waste under the TSCA when they sold the contaminated buildings to SIM. In-

deed, the letter, which Dico was not copied on, was dated after the 2007 transactions occurred.

Finally, defense expert Dr. Remy Hennet also testified as to his opinion that the EPA incorrectly classified the waste materials generated during the building dismantlement under the TSCA as PCB remediation waste rather than PCB bulk product waste. *See* 2017 Trial Tr. Vol. II at 475–77. The Court rejects this testimony as inadmissible under Federal Rule of Evidence 702 because it concerned a question of law rather than fact with respect to which Hennet has no specialized knowledge. Additionally, the opinion was not helpful to the Court in determining any fact in issue, as the proper classification of the waste materials generated during the building dismantlement under the TSCA is irrelevant to the question of the costs Defendants avoided given that the TSCA did not limit the EPA in its selection of disposal criteria for those materials.

pling data, and the Greenleaf data, the Court finds that a significant portion of the contaminated insulation in the regulated buildings sold to SIM contained PCBs in concentrations exceeding 50 parts per million or its equivalent.[42] More fundamentally, the Court finds that the EPA exercised primary oversight authority over all remediation efforts associated with the Dico site, including any efforts to demolish or otherwise remediate the buildings. As such, the EPA had the authority to direct that all demolition debris from the regulated buildings be tested and impose restrictions on the manner in which they were disposed, pursuant to which it was free to impose more stringent disposal criteria than the TSCA. See Clerk's No. 128 at 30 (concluding "the TSCA does not limit the EPA's ability to direct an appropriate response action under CERCLA in the event of a PCB release").[43] In the context of CERCLA remedial actions, the EPA regularly exercises this authority to require the disposal of PCB-contaminated waste with concentrations exceeding 50 parts per million as hazardous waste. See, e.g., 2017 Trial Tr. Vol. I at 121–22; see also Ex. 80 at DICOTRANX001267 ("All residual insulation shall be removed from the beams and shall be containerized and transported offsite for disposal in accordance with 40 C.F.R. § 761.62."). Furthermore, even when state officials perform oversight of remedial activities taking place on an NPL

Superfund Site on behalf of the EPA, the EPA retains its authority to determine the applicable disposal thresholds for resulting PCB-contaminated waste.

Contrary to Defendants' assertions, the Court finds Defendants were aware of the general magnitude of the costs associated with the removal and disposal of the contaminated insulation as set forth in the Feasibility Study. In addition to the detailed cost estimates in the Feasibility Study itself, the Record of Decision clearly indicated that the estimated cost associated with source layer removal/disposal was $2,824,600 and that removal of the contaminated insulation represented only one major component of that cost. Both the Feasibility Study and Record of Decision were publicly available. Cheri Holley received both documents in her capacity as Defendants' general counsel. Fechter reviewed the Feasibility Study following its release and discussed it with other Dico employees. MacDonald, who along with Barrentine sought information on the estimated costs associated with demolition of the buildings, reviewed the Record of Decision and retrieved information associated with the Dico site from the internet in his effort to evaluate redevelopment options available to Defendants. Given the significance of both the Feasibility Study and the Record of Decision, it would not be credible to suggest that no other employees or consultants who performed work pertaining to the Dico site on behalf of Dico reviewed and received copies of them as well.[44]

---

42. In reaching this conclusion, the Court notes the TSCA treats surficial PCB concentrations of 10 µg/100 cm² as equivalent to PCB concentrations of 50 parts per million. See 40 C.F.R. § 761.1(b)(3); see also Trial Tr. Vol. II at 510–12.

43. The Court notes Defendants appealed neither this subsidiary conclusion nor its broader ruling that the response actions the EPA undertook in connection with the SIM site were not inconsistent with the NCP. See Clerk's No. 128 at 17–20, 28–31. Accordingly, the Court concludes Defendants have waived any argu-

ment that the TSCA limited the EPA's ability to determine the disposal criteria for the PCB-contaminated insulation found at the SIM site.

44. The Court further notes that because the cleanup work performed in the contaminated buildings pursuant to the 1994 Order had been completed by November 1994, Defendants had no cause to conclude that the cost estimates in the Feasibility Study and Record of Decision diminished in their accuracy following the approval of the 1997 Final Report

· At trial, Defendants also suggested the Feasibility Study may have overstated costs associated with removing and disposing of the contaminated insulation because it failed to account for insulation removal that took place during the building removal action. With respect to this argument, the Court finds the following facts. During the building removal action, a minimal amount of uncontaminated insulation was removed from the unregulated buildings and disposed of as nonhazardous waste. Additionally, small amounts of damaged insulation were removed from scattered locations throughout the contaminated buildings and replaced. In total, thirty-six drums of insulation were removed and replaced, which amounted to no more than 5% of the insulation the contaminated buildings contained. The replacement insulation was subsequently painted with epoxy paint and encapsulated along with the remaining contaminated insulation. Accordingly, when removing the insulation from the buildings thereafter, it would have been difficult or impossible, and thus prohibitively expensive, to segregate the replacement insulation from the original contaminated insulation for purposes of disposal. Furthermore, even if segregation of the replacement insulation had been possible, it would have required testing to determine whether it was contaminated by PCBs that had migrated from the contaminated insulation and could not be disposed of as nonhazardous waste. The Court therefore rejects Defendants' suggestion that the removal of insulation during the building removal action could have reasonably been perceived to undermine the usefulness of the cost estimates contained in the Feasibility Study as a means of estimating the costs Dico avoided.

After close examination of the entire trial record and the arguments submitted by the parties, the Court concludes that the Feasibility Study represents the best available means of estimating the costs associated with removing and disposing of the PCB-contaminated insulation in the regulated buildings Defendants sold to SIM. In particular, the Court concludes the detailed cost estimate Black & Veatch prepared in analyzing the source layer removal/disposal alternative analyzed in the Feasibility Study is the best available evidence concerning the costs Dico avoided by selling the regulated buildings to SIM. The detailed nature of this cost estimate allows the Court to isolate the costs Dico avoided with respect to removal and disposal of the contaminated insulation.

In estimating the costs associated with the source layer removal/disposal alternative analyzed in the Feasibility Study, Black & Veatch estimated the direct costs associated with the disposal of insulation in the contaminated buildings to be $974,431 in 1996 dollars. *See* Ex. 253 at DICO-TRANX07264–65. These estimated direct costs included $127,505 for removal of insulation, $3176 for loading insulation into roll-off containers, $422,400 for transport to an offsite facility, and $421,650 in disposal costs. *Id.* To these estimated costs, Black & Veatch added the five contingencies for which the EPA customarily accounts in estimating remedial costs to account for anticipated variations in various aspects of direct costs. Applying these contingencies in their traditional sequence to the $974,431 in estimated direct costs for insulation removal and disposal—with the exception of the engineering design contingency, which the Court finds to be wholly unnecessary in the context of insulation removal and disposal—the Court concludes the approximate portion of the Feasibility Study cost estimate for the source layer removal/disposal alternative attributable to the insulation removal and disposal to be approximately $1,456,775.[45] This figure ac-

and issuance of the notice of completion by the EPA in May 1997.

**45.** As previously noted, the standard contingencies include bid and scope contingencies

counts only for estimated costs associated with insulation removal and disposal; it does not account for those associated with the removal of the concrete pads under the buildings or those associated with assessing or remediating residual PCB contamination remaining on interior building components after the insulation was removed.

To estimate the percentage of this value attributable solely to the regulated buildings sold to SIM in 2007, the Court carefully examined the notes and sketches in Appendix C to the Feasibility Study, which summarized information utilized in estimating the volume of insulation in each of the buildings covered by the 1994 Order. *See id.* at DICOTRANX07234–49. From this review, the Court concludes Black & Veatch determined Buildings 4 and 5 and the Maintenance Building contained approximately 154,522 square feet of insulation, or about 67.86% of the approximately 227,687 square feet of insulation contained in Buildings 1 through 5 and the Maintenance Building. 2017 Trial Tr. Vol. I at 58. Accordingly, the Court concludes the portion of Feasibility Study cost estimate for the source layer removal/disposal alternative fairly attributable to the insulation removal and disposal for Buildings 4 and 5 and the Maintenance Building to be 67.86% of the estimated insulation removal and disposal costs for all the regulated buildings, i.e., approximately $988,567.[46] The Court further notes that this figure

does not account for the estimated cost of the insulation removal and disposal associated with the western annex of Building 3, as the Court was unable to isolate the quantity of insulation contained therein from that contained in the rest of Building 3 based on the notes and sketches in Appendix C to the Feasibility Study.

The Government contends that in addition to avoiding costs associated with the removal and disposal in the covered buildings, Defendants also sought to avoid costs associated with remediating the steel beams. The Government points out the cost of remediating the residual contamination on the building components that remained following the removal of the contaminated insulation would not be duplicative, as these costs were not accounted for in the Feasibility Study's estimate of costs associated with the source layer removal/disposal alternative. The Government thus argues the Court should also include in its calculation of costs avoided the $537,000 Defendants actually paid to their removal action contractor for the sampling and decontamination of the beams transported to the SIM site. Defendants object to the inclusion of this figure in the Court's calculation of costs avoided because some of the beams on the SIM site originated in the unregulated production building. While the Court concludes this objection is well taken, for the reasons previously expressed, Defendants' associated allegation

(15% each) applied to the subtotal for all direct costs, followed by contingencies for permitting and legal costs (5%) and construction services (10%) applied to the successive subtotal, and then by engineering design costs (8%). Including all the standard contingencies, the Government estimates the portion of the Feasibility Study cost estimate for the source layer removal/disposal alternative attributable to the insulation removal and disposal to be approximately $1,573,800. 2017 Trial Tr. Vol. I at 58. Mary Peterson testified at trial as to the basic purpose of each contingency. The Court finds the engineering design

contingency, which covers variations in the cost of engineering services and drawings needed to support construction projects, does not apply in the context of insulation removal and disposal.

**46.** The Government estimates the portion of the Feasibility Study cost estimate for the source layer removal/disposal alternative attributable to the insulation removal and disposal for Buildings 4 and 5 and the Maintenance Building to be $1,067,980. 2017 Trial Tr. Vol. I at 58.

that the EPA misclassified the insulation and scarification waste for purposes of disposal is not.[47]

The Court agrees with the Government that the Feasibility Study anticipated residual contamination would remain on the building components following the removal of the insulation and that costs of assessing or remediating that residual contamination were not accounted for therein. *See id.* at DICOTRANX07147. Nonetheless, the Court finds the costs associated with remediating the steel beams at the SIM site do not necessarily represent a fair approximation of the costs Dico avoided for the remediation of residual contamination on the building components. What the evidence unequivocally shows is that if Defendants had removed the buildings in a manner that required them to absorb costs associated with residual contamination on the beams, they would have selected the least costly available alternative for doing so. The Government produced no evidence at trial that would support the conclusion that remediating the beams was that alternative; it is possible that disposing of the contaminated beams would have been less costly. Consequently, the Court declines to include the costs Defendants spent on remediating the beams at the SIM site in calculating the costs Dico avoided. On the contrary, the Court concludes that exclu-

sion of those costs from its calculation is appropriate given the lack of evidence indicating Defendants had a reasonable basis for anticipating they would be so significant. The costs Dico avoided are relevant to determining what Defendants intended when they sold the buildings to SIM only insofar as Defendants had reason to anticipate their general magnitude and nature.

Nevertheless, for several reasons, the Court finds the costs Dico avoided when Defendants sold the buildings to SIM far exceed the roughly $988,567 the Feasibility Study estimated for the removal and disposal of insulation in Buildings 4 and 5 and the Maintenance Building.

First, as previously noted, $988,567 represents an estimate of the insulation removal and disposal costs Dico avoided when Defendants sold Buildings 4 and 5 and the Maintenance Building. This calculation does not account for the insulation removal and disposal costs Dico avoided when Defendants sold the western annex of Building 3, which was also regulated under the 1994 Order.

Second, the Feasibility Study indicated the source layer removal/disposal would cost less than building removal/disposal, for which detailed cost estimates were never prepared. Thus, there is no question that $988,567, which represents a fraction

---

**47.** In support of this allegation, defense expert Dr. Remy Hennet testified as to his opinion based on the Greenleaf data that the quantity and concentration of the PCB residuals on the steel beams at the SIM site were low and inconsequential. *See* 2017 Trial Tr. Vol. II at 473–75, 510–27. The Court concludes this testimony is admissible. Having considered the testimony in its entirety alongside all evidence as to the quantity and concentration of PCBs found at the SIM site, however, the Court finds it to be unpersuasive.

As previously noted, the Court rejects as inadmissible the testimony by Hennet as to his opinion that the EPA incorrectly classified

the waste materials generated during the building disassembly under the TSCA as PCB remediation waste rather than PCB bulk product waste. *See* 2017 Trial Tr. Vol. II at 475–77. For the same reasons, the Court rejects as inadmissible his testimony as to his opinion that the EPA incorrectly classified the scarification waste generated during the remediation of the beams relocated to the SIM site under the TSCA as PCB remediation waste rather than PCB bulk product waste. *See* 2017 Trial Tr. Vol. II at 527–29. The Court further concludes his testimony as to this opinion was inadmissible because it was based on insufficient facts or data.

of the costs associated with source layer removal/disposal for just Buildings 4 and 5 and the Maintenance Building, significantly underestimates the costs Dico avoided when Defendants sold the regulated buildings to SIM.

Third, although Black & Veatch did not estimate the costs associated with the residual contamination that would have remained following the removal of the PCB-contaminated insulation, the Feasibility Study made evident that, at a minimum, sampling would be required to evaluate the magnitude of residual contamination. *See id.* The Feasibility Study thus alerted Defendants not only that residual contamination was anticipated, but also that the risk of residual contamination would necessarily entail, at a minimum, sampling costs beyond those associated with insulation removal and disposal.

Fourth, $988,567 represents an estimate of insulation removal and disposal costs Dico avoided by selling Buildings 4 and 5 and the Maintenance Building in 1996 dollars. The insulation removal and disposal costs associated with those buildings would have been significantly higher by 2007, when Defendants sold the regulated buildings to SIM.

In light of these considerations, the Court finds the costs Dico avoided by selling the contaminated buildings to SIM greatly exceeded the value Defendants received from SIM. While Defendants received $117,000 in cash and in-kind labor from SIM in exchange for the contaminated buildings, Dico avoided costs exceeding at least ten times that amount. Consequently, the Court concludes the balance of the value Defendants received from SIM compared to costs Dico avoided for proper disposal or remediation constitutes strong evidence of Dico's intent to avoid environmental liability through the sale of the contaminated buildings to SIM. Furthermore, because Titan Tire was equally aware of the general magnitude of the costs avoided through the sale and acted on behalf of Dico with respect to its involvement in environmental matters pertaining to the Dico site including the sale, the Court concludes the balance of the value Defendants received from SIM compared to costs Dico avoided for proper disposal or remediation also constitutes strong evidence of Titan Tire's intent to assist Dico in avoiding environmental liability through the sale of the contaminated buildings to SIM.

 d. *Additional facts suggestive of intent.* In addition to the foregoing, additional facts may be suggestive in considering whether a transaction was an arrangement for disposal or merely an ordinary sale. *Dico,* 808 F.3d at 350. For example, commercial realities associated with a transaction may suggest the seller intended to dispose of hazardous materials by entering into it. *See id.* Likewise, a seller's failure to inform a buyer that contamination exists may also suggest intentional disposal. *See id.*

The Court finds the following additional facts, which taken together and alongside the evidence as a whole, also suggest Defendants intended to dispose of a hazardous substance when they sold the contaminated buildings to SIM.

Industry standards of due diligence require sellers of industrial buildings to perform a thorough inquiry concerning any pertinent environmental restrictions before selling such buildings or allowing them to be dismantled, particularly if they are located on a Superfund Site. Both demolition experts who testified at trial agreed that industry standards of due diligence ordinarily require a seller of an industrial building to, at a minimum, (1) determine whether any of its environmental consultants or employees with personal knowledge of the history of the building are

aware of pertinent environmental restrictions, (2) perform a comprehensive internal records review of its files and those of its employees and environmental consultants for documents (e.g., correspondence, records, or reports) relevant to the building's environmental history, (3) conduct a public records search for information relevant to the building's environmental history, and (4) disclose known environmental contamination to the buyer or the demolition contractor hired to remove the building on behalf of the buyer.

Defendants did not perform a single one of these steps even though their general counsel and numerous employees and consultants knew the buildings on the Dico site were contaminated and subject to numerous EPA restrictions. That Defendants never informed SIM the buildings were contaminated or even mentioned the contaminated insulation during the months of negotiations and site visits preceding the 2007 transactions suggests they intended to deceive by omission. This suggestion is reinforced by the fact Defendants maintained their silence regarding the building contamination throughout the months-long dismantlement process, even *after* their employees observed SIM employees working onsite among the contaminated insulation and debris. Defendants ultimately informed SIM there were contamination concerns, of course, but not until approximately two months *after* the dismantlement process was complete, when George called Hughes after learning that a SIM employee had taken some insulation to his or her home.

Defendants had reason to anticipate that SIM would perform virtually no environmental due diligence upon purchasing the contaminated buildings. Having previously sold the Weld Shop to SIM in 2004, Defendants knew that Jim Hughes would not ask tough questions, perform independent inquiry, or hire his own environmental consultant or demolition expert, despite his personal knowledge that the Dico property was located on a Superfund Site. His actions did not even approach the level of environmental due diligence one would ordinarily expect from buyers of industrial buildings, particularly in the context of buildings located on a Superfund Site. Furthermore, having used SIM to perform mechanical maintenance for years, Defendants knew that SIM was a mechanical maintenance contractor who did not regularly dismantle buildings and had reason to anticipate that SIM was unfamiliar with demolition industry standard practices. And Defendants knew SIM planned to have its own employees take down the buildings, not hire a demolition contractor familiar with those practices to do so. Therefore, Defendants knew it was incumbent upon them to inform Hughes that the buildings were contaminated to ensure appropriate precautions were taken during the building dismantlement.

Defendants made no effort to find the buyer who would pay the highest price for the buildings. Defendants never advertised the buildings for sale or publicly solicited bids. Defendants did not have the buildings appraised. Rather, Campbell sold the buildings for precisely their book value, having no idea whether they had ever been appraised, even though he subjectively believed Defendants could have sold them for much more. Indeed, Campbell believed the steel beams the buildings contained were "worth a fortune" to a scrap dealer, and he offered no rational explanation for his decision to accept less for the buildings than he thought they were worth. 2017 Trial Tr. Vol. II at 336. The explanation Campbell gave for his decision to sell the buildings for less than what he thought they were worth—that selling them to SIM would benefit Titan Tire because the terms of the sale required SIM to perform in-kind labor for Titan Tire—strains credulity. Titan

Tire paid Dico for the in-kind labor it received from SIM for the buildings, and that labor was billed at SIM's ordinary rates. Furthermore, to the extent Campbell took into account the disposal costs SIM would incur to dispose of debris following the building dismantlement, his doing so merely suggests that SIM's willingness to absorb those costs played a role in his decision to sell the buildings to SIM rather than a different buyer; it does not follow that Campbell had determined SIM was willing to pay the highest net value for the buildings.[48]

Notwithstanding the significant value at stake in the 2007 transactions, Defendants did not treat those transactions in a manner consistent with their corporate practices or obligations. The Dico Board of Directors had met to duly authorize transactions divesting the company of property in both 1994 and 1996. *See* Ex. 1152 at D025871, D025882–83. But the Board never even discussed, let alone authorized, the 2007 transactions with SIM. Furthermore, neither Dico, nor Titan Tire on Dico's behalf, secured written consent for the 2007 transactions from Titan International, even though Dico was obligated to do so pursuant to the terms of its $11 million dollar mortgage agreement. Ex. 1010 at D022192. Failure to fulfill that obligation subjected Dico to the risk that Titan International would declare the full amount of the loan due immediately.

Though Dico realized no profit from liquidating the contaminated buildings for book value, it still realized tremendous economic benefits from the 2007 transactions with SIM. Given the contaminated status of the buildings, their removal yielded Dico a $720,000 increase in the market value of the Dico property. Clerk's No. 198 at 26 & n.44. Paradoxically, the following year, Gary Schuster successfully convinced the Polk County Assessor to dramatically lower its property tax assessment for the Dico property precisely *because* the buildings had been removed at the behest of Cheri Holley. Thus, another benefit Dico received from the 2007 transactions was a substantially reduced tax burden, as the tax assessed value of the Dico property dropped from $792,980 to $445,900 in 2008. Ex. 251 at TE0251–0013–14. The increase in the market value of the property and the decrease in the property tax liability associated therewith were independent of the value Dico received directly from SIM as reflected in the price SIM paid for the buildings.

Defendants contend that several other facts concerning the 2007 transactions demonstrate that they engaged in nothing more than "legitimate sales" of commercially useful products with respect to which arranger liability necessarily does not apply:

- Defendants sold the unregulated Weld Shop and the northern end of the unregulated Production Building to SIM for the same price per square foot as the contaminated buildings.
- Defendants negotiated the sale price of the buildings that were the subject of the 2007 transactions rather than taking SIM's initial offer.
- Defendants made the buildings available to SIM for inspection before the 2007 transactions were finalized.

---

48. The irony in Defendants' reliance on this justification to explain Campbell's decision is that Defendants had reason to know that Hughes had agreed to pay more for the contaminated buildings than they were subjectively worth to SIM, as Defendants had never informed Hughes that the buildings were contaminated and SIM paid the same price per square foot for the contaminated buildings as it paid for the unregulated—and apparently uncontaminated—Weld Shop in 2004 and the northern end of the unregulated Production Building in 2007.

- Defendants and SIM reduced the purchase agreements for the 2007 transactions to writing.
- SIM willingly paid Defendants more than the agreed-upon purchase price to reimburse costs Defendants had paid on its behalf *after* it was informed by Defendants that environmental issues existed with the buildings.
- SIM used its standard bid form as the purchase agreement for two of the 2007 transactions.
- SIM paid Defendants for the contaminated buildings rather than being paid by Defendants for them, and the amount SIM paid to Defendants was substantial.
- SIM invested substantial time and money in dismantling and transporting the buildings, used its own employees to perform the labor, and calculated the value of that labor using its standard billing rates.
- SIM determined the disposal locations for debris resulting from the dismantlement of the buildings.
- SIM intended to reassemble the buildings it purchased in 2007 just as it had reassembled the Weld Shop it purchased in 2004.
- The buildings that were not removed following the 2007 transactions remain on the Dico site, which has not been redeveloped.

Defendants suggest that taken together these facts constitute strong evidence they did not sell the contaminated buildings to SIM with the intent to dispose of a hazardous substance.

The Court disagrees. Considered in the context of other evidence submitted at trial, these facts do not constitute strong evidence of what Defendants intended when they entered into the 2007 transactions. First, though Defendants sold both unregulated buildings and regulated buildings to SIM for the same price, that is by no means conclusive evidence that their intent regarding the former was the same as their intent regarding the latter. Indeed, given that Defendants withheld information relevant to the sales of the regulated buildings from SIM, the fact that they sold both regulated and unregulated buildings to SIM for the same price is ambiguous at best. Second, the facts cited by Defendants indicating they treated the 2007 transactions with some degree of formality do not necessarily suggest they had pure intentions with respect to the transactions involving the regulated buildings. Given that the latter transactions involved the exchange of a significant sum (i.e., $160,200), *not* treating them with some degree of formality would have been so highly unusual as to risk alerting SIM that something was amiss. Third, the actions SIM took, though arguably suggestive as to what *SIM* intended with respect to the 2007 transactions, are irrelevant to the question of what *Defendants* intended when they entered into those transactions. As Defendants do not allege they exercised control over SIM, there is no basis upon which to conclude what SIM's conduct reflects Defendants' intent. Finally, the fact that Defendants have not yet pursued redevelopment of the Dico site hardly suggests that they never intended to do so.

On balance, the Court concludes the additional facts identified by the parties as being suggestive as to what Defendants intended when they entered into the 2007 transactions, taken together, weigh clearly in favor of concluding Defendants intended to dispose of a hazardous substance when they sold the contaminated buildings to SIM.

### 3. *Conclusion as to arranger liability.*

Having carefully analyzed the evidence admitted at trial and the parties' argu-

ments in light of the guidance issued by the Court of Appeals, the Court finds Defendants intended to dispose of a hazardous substance when they sold the contaminated buildings subject to the 1994 Order to SIM. Defendants began courting interest in the redevelopment of the Dico site long before Hughes approached Brown about purchasing the buildings. But Defendants understood that moving forward with redevelopment would be a costly and time-consuming endeavor and recognized that removing the buildings was a necessary prerequisite to redevelopment. The interest Hughes expressed in the buildings represented an opportunity for Defendants to eliminate some of the cost and bureaucratic burden associated with that prerequisite, thereby making the property more attractive and more valuable to potential developers without incurring the significant costs associated with building removal. It also represented an opportunity for Defendants to save money they otherwise would spend on security with no return on their investment, as Defendants were obligated to keep the contaminated buildings from being occupied to avoid the even greater costs associated with their productive use under the 1994 Order. Defendants anticipated that SIM would not exercise the level of due diligence necessary to discover the fact that the buildings were contaminated. So Defendants seized the opportunity to offload the contaminated buildings onto SIM, taking a calculated risk that the financial benefits associated with selling the buildings would outweigh the costs resulting from permitting them to be dismantled in violation of the 1994 Order. In doing so, Defendants chose to disregard the risks to human health and the environment that dismantling the contaminated buildings without proper precautions entailed.

Congress enacted 42 U.S.C. § 9607(a)(3) to discourage precisely this sort of arrangement. *See Burlington,* 556 U.S. at 610, 129 S.Ct. 1870; *Dico,* 808 F.3d at 347. By imposing strict liability on the owners of hazardous substances who arrange for their disposal, CERCLA makes clear that corporations who own hazardous substances are not free to gamble with human health and the environment in pursuit of the financial benefits associated with disposing of hazardous substances without taking protective precautionary measures. Defendants have not established any defense to strict liability. *See* 42 U.S.C. § 9607(b). Therefore, the Court concludes they are liable for "all costs of removal or remedial action incurred by the United States Government ... not inconsistent with the national contingency plan" pursuant to 42 U.S.C. § 9607(a).

### B. *Punitive Damages*

In 2014, this Court assessed punitive damages against Dico, but that award was vacated by the Court of Appeals following its determination that the matter of arranger liability—and the matter of liability for response costs associated with the SIM site by extension—could not be resolved on summary judgment. *Dico,* 808 F.3d at 354. However, the Court of Appeals explicitly anticipated this Court could award punitive damages once the matter of arranger liability was fully adjudicated, concluding "Dico might ultimately be found liable under a theory of arranger liability for its sale of the beams to SIM, but at this point a fact question remains that precludes summary judgment on arranger liability. So too with punitive damages." *Id.*

With respect to punitive damages, CERCLA provides that

> any person who is liable for a release or threat of release of a hazardous substance fails without sufficient cause to properly provide removal or remedial action upon order of the President pursuant to section 9604 or 9606 of this title ... may be liable to the United States

for punitive damages in an amount at least equal to, and not more than three times, the amount of any costs incurred by the Fund as a result of such failure to take proper action.

42 U.S.C. § 9607(c)(3). As interpreted by the Court of Appeals, this provision only "gives the district court discretion to award punitive damages within a range ... based on a specific dollar amount: the amount ... incurred in cleanup costs as a result of the liable party's failure to comply with the EPA order." *Dico*, 808 F.3d at 354.

■ ▇▇▇ It has previously been finally determined by this Court and by the Court of Appeals that Dico lacked sufficient cause to justify its noncompliance with the 1994 Order issued under § 9606. *See Dico*, 808 F.3d at 353–54; *see also* Clerk's Nos. 325 at 13–14, 326 at 3–9. Therefore, to determine whether Dico may be held liable for punitive damages, the Court must determine whether the response costs the Government incurred in connection with the SIM site resulted from Dico's failure to comply with the 1994 order. *See* Clerk's No. 298 at 16–21.

In reversing the punitive damages award, the Court of Appeals emphasized that the 1994 Order violations established at summary judgment involved the *disassembly* of the buildings at the Dico site and the subsequent *failure to notify* the EPA of this change in conditions, not necessarily the *sale* of the buildings to SIM. *Id.* The Court of Appeals then reversed the summary judgment award of punitive damages on the ground that the costs associated with response actions taken at the SIM site lacked a proven causal connection to the 1994 Order violations established at summary judgment. *See id.* However, the Court of Appeals anticipated such a causal nexus could be established at trial if the Government proved Defendants intentionally arranged for the disposal of a hazard-

ous substance by selling the beams to SIM. *See id.* Indeed, the Court of Appeals expressly acknowledged the response costs the Government incurred in connection to the SIM site "arose as a result of" and "derived from" that sale. *See id.*

This Court has now determined that Defendants intentionally disposed of the hazardous substances the contaminated buildings subject to the 1994 Order contained through the sale to SIM. Furthermore, the facts established at trial leave no question that the act of intentionally disposing of the PCBs the buildings contained by selling them to SIM encompassed not only the act of allowing buildings subject to the 1994 Order to be dismantled but also the specific intent that the fruits of that dismantlement (the steel beams, insulation, and other building materials) be transported from the Dico site to other locations, one of which Defendants knew to be the SIM site. In fact, getting the contaminated buildings off the Dico site in anticipation of its future redevelopment was Defendants' primary objective when they entered into the 2007 transactions, and the majority of the financial benefits Defendants enjoyed following their consummation derived from the fact that the contaminated buildings were no longer on the property. Accordingly, the Court concludes the Government has established that a causal nexus exists between the response costs it incurred in connection with the SIM site and the conduct by which Dico violated the 1994 Order sufficient to support an award of punitive damages based on those costs. Thus, although the act of arranging for the disposal of the hazardous substances within the buildings subject to the 1994 Order may not have constituted a violation of that order standing alone, there is no question that the act of following through with that arrangement clearly *did* constitute a violation of the order, as doing so resulted in complete devastation of the sealing and encapsulation of the building insulation.

As the Court of Appeals concluded, the 1994 Order "required Dico to maintain and protect the integrity of the sealing and encapsulation of the building insulation." *Id.* at 352. Thus, following through with the arrangement to dispose of the hazardous substances the buildings contained through the sale of the buildings to SIM resulted in the Government incurring response costs associated with the SIM site and constituted a clear violation of the 1994 Order. The Court concludes the Government incurred those response costs as a result of Dico's failure to comply with the 1994 Order.[49]

On the facts of this case and pursuant to the plain language of CERCLA, the Court concludes Dico may be liable for punitive damages in the amount of one to three times the amount of "any costs incurred" by the Government because those costs were incurred as a result of Dico's failure to comply with the 1994 Order. *See* 42 U.S.C. § 9607(3); *see also Dico*, 808 F.3d at 354–55. This Court previously determined an award of punitive damages equal to the amount of the Government's response costs is appropriate in this case. Clerk's No. 198 at 29–30. After considering the nature of the conduct by which Dico violated the 1994 Order and the circumstances under which Dico engaged in that conduct as established during the bench trial on remand, the Court concludes an award of punitive damages equal in amount to the Government's response costs is appropriate. *See Dico*, 808 F.3d at 354 (concluding CERCLA "gives the district court discretion to award punitive damages within a range"); *see also Solid State Circuits, Inc. v. EPA*, 812 F.2d 383, 391 n.11 (8th Cir. 1987) (discussing the discretionary nature of CERCLA's punitive damages provision); *United States v. LeCarreaux*, No. 2:90-cv-01672, 1992 WL 108816, at *13 (D.N.J. Feb. 19, 1992) (concluding "the nature of a defendant's conduct may be relevant in assessing punitive damages" under CERCLA). The Court therefore concludes Dico is liable for punitive damages equal to the amount of response costs the Government incurred in connection response actions taken at the SIM site. *See* 42 U.S.C. § 9601(25) (defining the term "response" to mean "remove, removal, remedy, and remedial action" and "enforcement activities related thereto").

## V. RESPONSE COSTS

The parties have stipulated that the Government has incurred a total of $5,454,370 in response costs and interest.[50]

---

**49.** In arriving at this conclusion, the Court rejects Defendants' argument that it should not be held liable for punitive damages because Dico could have been found liable for punitive damages based on costs the Government incurred at the SIM site if it had declined to comply with the 2008 Order. The Court concludes punitive damages are appropriate based on application of the plain language of CERCLA to the facts before it. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (discussing the basic principle of statutory interpretation that a statute's plain language is controlling). The Court declines Defendants' invitation to ignore the plain language of CERCLA based on their speculative application of a novel interpretation of the statute to purely hypothetical facts.

**50.** The total figure represents a sum consisting of the following component amounts:

Clerk's No. 317 at 9. This Court previously determined that if the Government proved Defendants are liable as arrangers under § 9607(a), Defendants would be jointly and severally liable for all response costs the Government incurred in connection with this action that are not inconsistent with the NCP, including attorney fees and other enforcement costs the Government incurred pursuing its claims based on §· 9606(b). Clerk's No. 298 at 21–31. ·

Defendants do not dispute the consistency with the NCP of the response costs the Government incurred in connection with the SIM site. And as the Court has previously noted, Defendants bear the burden of proving response costs the Government incurred were inconsistent with the NCP. Clerk's No. 128 at 18–19 (citing *Minnesota v. Kalman W. Abrams Metals, Inc.*, 155 F.3d 1019, 1025 (8th Cir. 1998); *United States v. E.I. Dupont De Nemours & Co.*, 432 F.3d 161, 178 (3d Cir. 2005)). The Court therefore concludes all the response costs incurred by the Government in connection with reported response actions taken at the SIM site were consistent with the NCP. In so concluding, the Court notes it previously determined that all response actions taken by the Government disclosed prior to the issuance of its March 2013 order were consistent with the NCP. *See* Clerk's No. 298 at 37–41; *see also* Clerk's No. 128 at 17–31. Furthermore, the Court notes that the Government produced evidence at trial indicating all its previously undisclosed response actions were of the same type as those disclosed prior to the trial. ·

The Court further concludes that Defendants are jointly and severally liable for the entirety of the stipulated response costs and interest pursuant to 42 U.S.C. § 9607(a). Defendants who wish to avoid joint and several CERCLA liability bear the burden of proving a reasonable basis for apportionment exists. *See Burlington*, 556 U.S. at 614–15, 129 S.Ct. 1870. Defendants have offered no "concrete and specific" evidence supporting divisibility. *Hercules*, 247 F.3d at 718. ·

The Court therefore concludes Defendants are jointly and severally liable for $5,454,370 in response costs and interest already incurred and ·reported by the Government in connection with the SIM site as a result of their having arranged for the disposal of a hazardous substance pursuant to 42 U.S.C. § 9607(a), including all enforcement costs and attorney fees it incurred in connection with this action. In addition, the Court concludes Defendants are jointly and severally liable for all such response costs previously incurred but not previously reported by the Government, all such response costs the Government may incur the future, associated · enforcement costs and attorney fees, and interest on those costs. *See* 42 U.S.C. § 9613(g)(2).

Additionally, the Court concludes Dico is liable for $5,454,370 in punitive damages pursuant to 42 U.S.C. § 9607(c)(3), a single

| | |
|---|---|
| EPA Costs (7/1/2008–10/31/2009): | $92,015 |
| EPA Costs (11/1/2009–9/30/2016): | $2,094,692 |
| DOJ Costs (10/1/2009–4/6/2013): | $1,382,232 |
| DOJ Costs (4/7/2013–9/3/2016): | $1,746,906 |
| Interest on EPA Costs (through 12/31/2016): | $59,747 |
| Interest on DOJ Costs (through 12/31/2016): | $78,778 |
| Total: · | $5,454,370 |

*See* Exs. 1156, 1157R.

multiple of the response costs heretofore reported by the Government.

## VI. CONCLUSION

The Clerk of Court shall enter judgment (1) holding Dico and Titan Tire arranged for the disposal of a hazardous substance in violation of 42 U.S.C. § 9607(a); (2) holding Dico and Titan Tire jointly and severally liable for $5,454,370 in response costs previously incurred and reported by the United States in connection with the SIM site as a result of their having arranged for the disposal of a hazardous substance in violation of 42 U.S.C. § 9607(a), including enforcement costs and attorney fees it incurred in connection with this action; and (3) holding Dico liable for $5,454,370 in punitive damages under 42 U.S.C. § 9607(c)(3), an amount equal to one times the response costs previously incurred by the United States as a result of Dico's violation of a unilateral administrative order issued pursuant to 42 U.S.C. § 9606.

The Court hereby grants a declaratory judgment to the United States pursuant to 42 U.S.C. § 9613(g)(2) holding Dico and Titan Tire jointly and severally liable for all response costs previously incurred by the United States in connection the SIM site associated with their having arranged for the disposal of a hazardous substance in violation of 42 U.S.C. § 9607(a) but not yet reported, all response costs the United States may incur in the future in connection the SIM site associated with their having arranged for the disposal of a hazardous substance in violation of 42 U.S.C. § 9607(a), all enforcement costs and attorney fees associated with this action, and interest on those costs. This declaratory judgment shall be binding on any subsequent motion or action to recover further response costs or damages; any such motion or action must be commenced no later than three years after the date of completion of all response action undertaken by

the United States in connection with this action. 42 U.S.C. § 9613(g)(2). The Court retains jurisdiction over the matters of additional response costs and interest.

IT IS SO ORDERED.